(117 App. Div. 80)

In re LONG ACRE LIGHT & POWER CO.

(Supreme Court, Appellate Division, First Department. January 18, 1907.)

1. MANDAMUS—ALTERNATIVE OR PEREMPTORY—DENIALS IN ANSWER.

Mandamus is not required to be in the alternative rather than the
peremptory form, on the ground that the answer raises issues of fact,
the allegations of the petition being positive and explicit in detail, and
being met for the most part by denials of knowledge or information, or
by denials positive in form, but which obviously put in issue not facts,
but the conclusions of law arising from the facts stated in the petition.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 33, Mandamus, §
325, 407, 408.]

2. MUNICIPAL CORPORATIONS—USE OF STREETS—GRANT OF FRANCHISE—CON-
STRUCTION.

There is a conveyance of the franchise itself, and not of a mere right
under it, by an instrument granting "the sole and exclusive right and

privilege to operate for all purposes under the franchise," given cor-
poration by a city to use its street for conducting electricity.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 36, Municipal Cor-
porations, §§ 1481, 1482.]

3. ELECTRICITY—SUBWAY COMPANY—QUESTIONING RIGHT OF APPLICANT FOR
SPACE.

So far as concerns the Electrical Subway Company, which is required to
lease space in its conduits in New York City to any corporation having
"lawful power" to operate electrical conductors in the streets of the
city, it is enough that an applicant for space has such a special franchise
by assignment, and that under such assignment electricity has been fur-
nished to customers by way of the streets, with the acquiescence of the
city.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 18, Electricity, § 1.]

4. CORPORATIONS—TRANSFER OF SPECIAL FRANCHISE TO INDIVIDUAL.

It is no defect in the chain of title to a special franchise to operate
electrial conductors in the streets of a city that it was first assigned,
by the corporation to which it was granted, to an individual, especially
where he served merely as a medium for the transfer to another com-
pany.

5. ELECTRICITY—SUBWAY COMPANY—APPLICATION FOR SPACE—CONSENT OF
COMMISSIONER.

Under the rules of the commissioner of water supply, gas, and electricity
of the city of New York providing that when application has been
made to the Electrical Subway Company for space in its conduits, and
space has been assigned, the consent of the commissioner must be ob-
tained before any conductors of electricity are placed in the space so
assigned, the subway company may not refuse an application for space
because such consent of the commissioner has not been first obtained.

Ingraham and Laughlin, JJ., dissenting.

Appeal from Special Term, New York County.

Application of the Long Acre Light & Power Company for man-
damus to compel the Consolidated Telegraph & Electrical Subway
Company to assign space in its subway. From an order (101 N. Y.
Supp. 460) granting a peremptory writ, said subway company ap-
peals. Affirmed.

Argued before PATTERSON, INGRAHAM, LAUGHLIN,
CLARKE, and SCOTT, JJ.

Alton B. Parker and Beardsley & Hemmens, for appellant.

Austen G. Fox and A. J. Dittenhoefer, for respondent.

SCOTT, J. This proceeding involves the right of the relator, an
electric light company, to obtain an allotment of space for its wires in
the under ground conduits belonging to the Consolidated Telegraph
& Electrical Subway Company (hereinafter for brevity's sake called
the "Subway Company"). The organization of the Subway Company,
and its erection and maintenance of underground conduits for electrical
conductors, marked the culmination of the long struggle, now passed
into familiar history, to compel the removal from the streets and public
places on Manhattan Island of the poles and wires once used for tele-
graph, telephone, and electric light wires. The powers, duties, and ob-
ligations of the respondent company are derived from and defined by
two certain contracts, dated, respectively, July 27, 1886, and April 7,
1887, between said company and the commissioners of electrical subways
for the city of New York, which were ratified and confirmed by the

Legi▓▓re by·chapter 716, p. 928, Laws 1887. By these contracts the ▓▓▓ay Company was authorized to construct conduits for carrying ▓▓▓,and, among other things, it was provided that the spaces in ·suc▓▓duits should be leased to any corporation "having lawful po▓▓ to operate electrical conductors in any street, highway or public pl▓e in the city of New York that may apply for the same, including a▓y company or corporation having or which shall acquire lawful power to manufacture, use or supply electricity." The contract also undertook to provide against the danger that some one company, by leasing more space that it required, should ·prevent other companies from acquiring space, and further provided for the building of·additional conduits as they might be needed. The commissioners of electrical subways agreed on their part to use all lawful means to compel companies operating electrical conductors to rent space in the subways, and the Legislature, by section 3 (page 929) of the ratifying act, provided that wherever the conduits has been built all poles and wires should be removed, forcibly if necessary, from public streets and places, and in point of fact such poles and wires, including those erected and operated by the predecessor in interest of this relator, were subsequently removed by the public authorities of the city. The ratifying act of 1887 also included a remedy by writ of mandamus in case the Subway Company should fail to perform the duties and obligations assumed by it. The present relator, claiming to be entitled to lay and operate electrical conductors in this city, has applied to the subway company for an allotment of space in the subway now constructed in Forty-Second street, and has tendered payment of rental for one year in advance at the rate fixed and charged by said Subway Company. That company has refused to allot such space, and resists the application for a mandamus upon several grounds, but chiefly relies upon the objection that the relator's company has not "lawful power to operate electrical conductors in the streets." But first it says that by its answer to the petition it has raised issues of fact, and that, for this reason, if any mandamus at all is to issue, it should be in the alternative and not the peremptory form. This objection is satisfactorily answered by the learned justice at Special Term, and requires no extended discussion at our hands. As he points out, the allegations of the petition are positive and explicit·in detail, and are met for the most part by denials of knowledge or information. or by denials, positive in form, but which obviously put in issue not facts, but the conclusions of law arising from the facts as stated in the petition. The principal controversy arises over the denial by the Subway Company that the relator has any legal right or lawful power to operate electrical conductors under the streets, or has lawful power to manufacture, use, or supply electricity. The right which the relator asserts, and which is thus called in question, rests upon a franchise granted by the municipal authorities of the city of New York to the American Electric Manufacturing Company in 1887.

The facts under which the relator claims the right to operate under this franchise are set forth at length in the petition and are briefly as follows:

The American Electric Manufacturing Company was incorporated on March 28, 1885, under the general manufacturing corporation act of 1848 (Laws 1848, p. 54, c. 40), which seems to have been the only appropriate act in force at that time under which such a company could have been incorporated. The purposes of said company as stated in its certificate of incorporation are very broad, covering, "the manufacture, generation, utilization and sale of electricity," as well as the manufacture, leasing, and sale of electrical apparatus and appliances, and the purchase and sale of patent rights and the like. On May 27, 1887, the board of aldermen of the then city of New York, by resolution (approved by the mayor June 13, 1887), gave and granted to the American Electric Manufacturing Company permission and authority "to locate and erect poles, and hang wires and fixtures thereon, and to place, construct and use wires, conduits and conductors for electrical purposes in the city of New York in, over and under the streets, avenues, wharves and parks therein according to such plans as may be directed, approved or allowed by and subject to the powers of the electrical subway commissioners and to the provisions of chapter 499 of the Laws of 1885, and under the supervision of the commissioner of public works and of the department of public works within their respective territorial jurisdiction, and subject also to all existing ordinances applicable thereto, and to all reasonable regulations of the privilege hereby conferred which the common council may hereafter impose by ordinance or otherwise." The resolution also makes provision for compensation to the city for the privilege thus conferred. This resolution constitutes the grant of franchise under which the relator claims the right to operate electrical conductors. Its title thereto is derived as follows: On April 18, 1888, the American Electric Manufacturing Company by an instrument in writing "granted" to Frederick E. Townsend, his executors, administrators, and assigns, "the sole and exclusive right and privilege to operate for all purposes, under the franchise, permission, privilege, authority or right granted to it by the board of aldermen of the city of New York by a resolution adopted by said board on the 31st day of May, 1887," reciting the terms of such resolution. The language of this instrument is criticised as being a grant of a right under a franchise, and not an assignment of the franchise itself. What was granted to the manufacturing company was the right to do certain things. That right constituted its special franchise, and was property. What was "granted" to Townsend was "the sole and exclusive right and privilege to operate for all purposes under the franchise, privilege, permission, authority or right granted to it by the board of aldermen of the city of New York by resolution adopted by said board on the 31st of May, 1887." In other words, the company granted or conveyed to Townsend the right—i. e., the franchise which had been given to it by the board of aldermen— and it gave him the "sole and exclusive right," reserving nothing which it could use itself or transfer to any one else. It is not easy to see how, by any words, a more complete assignment could have been made.

On March 14, 1889, the American Electric Illuminating Company was incorporated under the act of 1848; the objects of its incorporation being the "manufacture, sale, leasing and ownership of appliances,

letters patent and plant for electric light, heat, power and motion, and the manufacture, sale and transmission of electric light, heat, power and motion." To this corporation, by a paper dated April 19th, 1889, Frederick E. Townsend, gave, granted, sold, assigned, transferred and set over "any right, title and interest I have and hold or may have and hold, as trustee for such American Electric Illuminating Company, or individually in and to and under the paper, writing and assignment dated April 18th, 1888, made by the American Electric Manufacturing Company, a company duly organized under the laws of the state of New York, unto me, and the rights, permission, privilege, franchise and authority therein referred to." The American Electric Illuminating Company proceeded to operate under this franchise to the extent that it established a generating plant, erected poles, and strung wires, and for more than a year manufactured electricity and supplied it to customers. Its poles and wires were then cut down and removed by the public authorities, and its business, or the major part thereof, was thereupon suspended. In 1897 a judgment creditor began sequestration proceedings against the company, which resulted in the appointment of a receiver, and the sale by him, under the order of this court, of the franchise to carry on business in the city of New York. The purchaser on such sale was one Martin Minturn, and the sale to him was duly confirmed. The relator was incorporated on April 23, 1903, under the transportation corporations law, with ample powers, so far as concerned its certificate of incorporation, to generate, sell, and distribute electricity, and to construct, maintain, and operate conductors therefor. On March 21, 1906, Martin Minturn, by an instrument in writing, gave, granted, sold, assigned, transferred, and set over to the relator any and all his right, title, and interest of every nature and kind in and to and under the above-described franchise.

The respondent, relying upon that clause of its contract which requires it to furnish space in its conduits only to companies having "lawful power" to operate electrical conductors in this city, defends its refusal to accord space in said conduits to relator by the contention that said relator has not such lawful power, and owns no franchise to operate such conductors granted either by the Legislature or the municipal authorities, or any other body competent to grant such a franchise. The relator's title to the franchise under which it claims the right to operate, and the history of which has been given, is questioned because, as it is said, the American Electric Manufacturing Company could not assign to Townsend the franchise granted to it by the board of aldermen, and consequently Townsend took nothing under the attempted assignment to him, and could convey nothing to his assignee, the American Electric Illuminating Company. This contention is based upon the general proposition that a company chartered to perform duties of a public, or quasi public, nature, cannot, without legislative authority, alienate or convey away its right to perform such duties, or the property necessary to their performance. In support of this general proposition, there are cited to us numberless extracts from text-books and judicial opinions. That there is such a rule of law is not open to question, but like most general rules it is subject to exception and qualification both as to its applicability to specific cases

and as to the persons who may invoke it. It remains, therefore, to consider whether or not it is applicable to the circumstances of the present case, and whether or not, in any event, it may be invoked by this respondent.

The American Electric Manufacturing Company derived its primary franchise to be a corporation directly from the Legislature, and with it the power to engage, as a corporation, in the various kinds of business specified in its certificate of incorporation. The right thus conferred involved no public or quasi public duty. The secondary or special franchise to operate a line or lines of electrical conductors, which is the only franchise involved in this proceeding, was granted by the board of aldermen, the proper municipal authority to make such grant. West Side Electric Co. v. Consol. Tel. Co., 110 App. Div. 171, 96 N. Y. Supp. 609. The general rule that a special or secondary franchise is inalienable without express legislative assent has lost practically all its authority in this state. From early days railroad corporations have had legislative authority to transfer to other railroad corporations the special privilege of operating the road (Woodruff v. Erie R. Co., 93 N. Y. 609–616), and all other corporations were accorded that right by chapter .638, p. 1436, of the Laws of 1893. The relaxation of the general rule is undoubtedly due to the freedom with which corporate charters are now given, and to the universal recognition of the property, nature, and value of special franchises. A special franchise is generally accompanied by the grant of the right to use or occupy public property, or to exercise the essentially sovereign power to acquire property by eminent domain, and the consideration for the grant is found in the quasi public service to be rendered. The reason for the rule against alienation of such a franchise is that, by divesting itself of the franchise, the corporation would disable itself from discharging the public duties for which it had been chartered, and the public has, therefore, been considered as entitled to forbid such a transfer. When a charter can be obtained by merely executing and filing a certificate, as was the case when the Electric Manufacturing Company was organized, and the exercise of the special franchise carried with it the public obligation, the reason for the rule largely disappears, especially where, as in the case of a manufacturing company, the sale and distribution of electricity was only a part of the objects for which the company was incorporated. Whether or not a special franchise be availed of, and by whom it is availed of, is solely a question of public concern. It is not questioned that the grantor of a special privilege might, as a condition of its grant, attach the quality of assignability to it, and the same power which conferred the franchise may ratify and confirm the alienation thereof when attempted to be effected without precedent authority. Thompson on Corporations, vol. 4, par. 5361; Shaw v. Norfolk Ry. Co., 5 Gray (Mass.) 162; Richards v. Merrimack, etc., R. Co., 44 N. H. 127. It is not essential that such ratification shall assume any particular form. It is sufficient if it be evidenced by acts which recognize the validity of the alienation or assignment, and are inconsistent with any objection thereto. The franchise was granted by the board of aldermen, not as individuals, but as the proper local authority to act, in that

regard, as and for the municipality. The grant was, therefore, a grant from the city, the owner of the streets, for the use and benefit of the public. It was the city, therefore, the grantor of the franchise, which had the power to consent to and ratify the assignment of the franchise.

The record shows that the American Electric Illuminating Company, claiming and owning no better right to do so than the franchise in question, and the title thereto, through the assignment to Townsend, did in fact erect poles in the streets of the city and string wires thereon, and supply electricity to its customers by means of such poles and wires, and continue to do so until the completion of respondent's subways, and the forcible removal by the public authorities of all the poles and overhead wires then maintained in the more populous section of the city in Manhattan Island. Unless the American Electric Illuminating Company had municipal authority to erect poles and string wires, these structures constituted illegal obstructions, which it was the duty of the municipal authorities to remove. We are not to presume that public officers willfully fail to do their duty, and, in view of the acute public and official opposition at that time to the maintenance of overhead wires, we should find it difficult to believe that the public authorities stood by and permitted a wholly unauthorized company to add to the unsightly structures then generally condemned, and permitted the company to expend its money in erecting such structures. Of course, we do not intend or undertake to pass upon any question that may arise between the city and the relator, but the acquiescence of the city in the acts of the illuminating company appear to indicate prima facie a ratification of and consent to the devolution upon that company of the title to the franchise originally given to the manufacturing company, and if the illuminating company, when its poles and wires had been cut down, had at once applied for space in the subway, we much doubt whether it could have been denied. If it had a right to entrance then, it does not appear that its right has been lost by anything that has transpired since.

We are next brought to consider whether the respondent is in a position to call into question the validity of the relator's title to the special franchise in question. The respondent is a private corporation, operating for its own gain. The contracts between it and the commissioners of electrical subways, as well as the act ratifying these contracts, are replete with provisions designed to prevent the monopolization of the subways. The respondent is invested with no authority to grant or withhold privileges, or to discriminate between rival applicants for space in its conduits. It is vested with no governmental functions, and represents in no sense the public either of the state or the city. Whether or not a special franchise may be assigned is a matter of public, and not of private, concern. Such an assignment is not malum in se, and the only ground for ever questioning the assignability of such a franchise is that the public were interested in its exercise by the original grantee. Accordingly, it has been held that only the public may question the validity of an attempted assignment, and that it is not a question to be raised collaterally or by any private individual. Thompson on Corpns. vol. 4; par. 5367; Oakland R. Co. v.

Oakland, etc., R. Co., 45 Cal. 365, 13 Am. Rep. 181. A similar rule has uniformly been applied as to, the right to question the validity of a company's incorporation, a closely analogous question. Thus, where an attempt has been made to create a corporation by papers with the color of law, but so far defective in execution that they would be held, in a direct proceeding, to be defective and ineffectual, and the corporation has exercised its corporate powers, it is well established that the corporation is safe from collateral attack by any person by reason of its defective incorporation, and can be directly attacked only by the state. Lamming v. Galusha, 81 Hun, 247, 30 N. Y. Supp. 767; Buff. & Atl. R. Co. v. Cary, 26 N. Y. 75; Eaton v. Aspinwall, 19 N. Y. 119. The relator stands in this precise position. It holds the franchise to operate under a formal assignment from the original grantee, and its predecessor in title, holding under the same assignment, actually exercised the privilege conferred by the franchise. We do not, of course, hold that the respondent is obliged to assign space in its conduits to every one who may apply, or that it may not, before assigning such space, inquire whether the applicant has a right to enter, but we are of opinion that when application is made by a corporation having apparent right to a franchise, and which has actually, with the acquiescence of the public authorities, exercised the franchise, the validity of its right and title is not open to collateral attack. If, for any public reason, there is a doubt as to the validity of the title, that question can be raised by the proper municipal auhority when application is made for a permit. If not then raised, the question is of no concern to the respondent. That the franchise was assigned in the first instance to an individual does not suggest any defect in the chain of title. We are not aware of any statutory or inherent reason why the right to construct and maintain electrical conductors may not be conferred upon an individual, and none has been suggested. At all events, Townsend, the assignee, never attempted to use the franchise, but seems to have served merely as a conduit through whom the franchise passed from one company to another. Such a method of transfer is not invalid. Parker v. Elmira, C. & N. R. R. Co., 165 N. Y. 274–280, 59 N. E. 81. Before actually stringing its wires, it is necessary that relator shall have, not only an allotment of space, but also a permit from the commissioner of water supply, gas and electricity. It seems to be quite unimportant which is applied for first, and would be of no importance whatever, were it not for the rules made by the commissioner of water supply, gas and electricity governing such application. These rules cover both applications for leave to construct subways and for leave to enter subways already constructed. As to the latter, rule 3, read upon the motion, is applicable. It is subdivided into two parts, designated "a" and "b." Subdivision "a" requires that application for space must be made to the subway company and certain particulars given. Subdivision "b" reads as follows:

"When applications have been made and space assigned for conduits under ground, the written consent of the Commissioners must be obtained before any conductors are placed in the space so assigned."

If the relator had applied to the commissioners before he obtained an allotment of space, his application might well have been, and doubtless

would have been, refused under this rule. The unverified letter of the deputy commissioner that a contrary rule has obtained in practice cannot be considered in contradiction of the plain letter of the rule.

It is also suggested that the special franchise itself requires certain p'ans to be approved before the franchise can be operated. The grant was of the right to erect poles and hang wires thereon, as well as to place wires underground, and provided that all should be done "according to such plan as may be directed, approved or allowed by and subject to the power of the electrical subway commissioners." If the relator were applying for leave to construct conduits for its wires, it would undoubtedly be required to construct them under approved plans; but this is not what it asks. It wishes to draw wires through conduits already constructed according to plans which have been directed, approved, and allowed by the subway commissioners, which is precisely what the franchise calls for. It is stated in an affidavit included in the papers read in opposition to the motion that there are not sufficient subways constructed in the locality requested by the relator, and that, if this application were granted, additional subways wou'd necessarily have to be constructed, for which under the statute the relator would be obliged to give a bond. It is not asserted that any such bond has been demanded, and it is made quite clear that the respondent does not rely upon this objection to relator's application because it is stated in the same affidavit, made by respondent's superintendent, that "the sole reason why the respondent has refused to comply with the request of the relator is that neither has the relator been duly authorized to conduct the electric light business in the city of New York either by legislative act, or administrative act, nor is the respondent empowered by law to allot space in its subways upon the app ication made"; and in the formal answer by respondent to relator's petition it is not alleged, as a reason why the mandamus should not issue, that there are no available ducts. Hence the existence of available ducts is not put in issue. In any event, the commissioner of water supply, gas and electricity has power to order new conduits to be constructed, and it appears by his own rules that he will do so when, and if, he is satisfied that the unused facilities of existing subways are insufficient to meet existing requirements.

We are of opinion that, as against the respondent, the relator has established its right to the allotment of space in the conduits, and the order appealed from is therefore affirmed, with $10 costs and disbursements.

PATTERSON, P. J., and CLARKE, J., concur.

INGRAHAM, J. (dissenting). The relator has obtained a peremptory writ of mandamus requiring the Consolidated & Electrical Subway Company to grant to the Long Acre Light & Power Company space in its subway ducts for the placing of the electrical conductor therein, extending through various streets in the city of New York. The proceeding was instituted by an order to show cause, based upon affidavits, and a peremptory writ was granted upon motion. To entitle

the relator to a writ of mandamus he must show by undisputed facts a clear legal right to the relief demanded. People ex rel. Sherwood v. Board of State Canvassers, 129 N. Y. 360, 29 N. E. 345, 14 L. R. A. 646. If any question of fact upon which the relator's right to relief depends is presented, or if there is a serious doubt about his legal right to such relief, the peremptory writ should be denied, and an alternative writ granted. I think upon the facts as they appeared before the court below the re'ator had not a legal right to the relief that he asks for. The relator's claim is as the owner of a franchise granted by the board of aldermen to the American Electric Manufacturing Company. It appeared that the American Electric Manufacturing Company was incorporated under the manufacturing corporation act of 1848. Laws 1848, p. 54, c. 40.

On the 31st day of May, 1887, the board of aldermen passed a resolution by which permission and authority was granted to the American Electric Manufacturing Company to locate and erect poles, and hang wires and fixtures thereon, and to place, construct, and use wires, conduits, and conductors for electrical purposes in the city of New York in, over, and under the streets, avenues, wharves, and parks therein specified, according to such plans as may be directed, approved, or allowed by and subject to the powers of the electrical subway commissioners, and subject to the provisions of chapter 499, p. 852, of the Laws of 1885, and under the supervision of the commissioner of pub'ic works and to the department of public parks, within the respective territorial jurisdictions. Nothing seems to have been done under this resolution by the American Electric Manufacturing Company; but on the 18th day of April, 1888, there was executed an instrument by which the American Electric Manufacturing Company granted unto one Townsend, his administrators and assigns, "the sole and exclusive right and privilege to operate for all purposes under the franchise, privilege, permission, authority or right granted to it by the board of aldermen of the city of New York, by a resolution adopted by the said board on the 31st day of May, 1887, to locate and erect and set up poles and hang wires and fixtures thereon, and to place, construct and use wires, conduits and conductors for electrical purposes in the city of New York, in, over and under the streets, avenues, wharves, piers and parks therein or adjacent thereto, according to such p'ans as may be directed, approved or allowed by and subject to the powers of the electrical subway commissioners, and to the provisions of chapter 499 of the Laws of 1885." Subsequent to the execution of this instrument, on the 29th day of December, 1888, there was incorporated under the manufacturing act of 1848 the American Electric Illuminating Company, and on the 19th day of April, 1889, Townsend assigned and transferred to this corporation "any right, title, and interest I have and hold or may have and hold, as trustee for such American Electric Illuminating Company, or individually in and to and under the paper, writing and assignment, dated April 13, 1888, made by the American Electric Manufacturing Company, a company du'y organized under the laws of the state of New York, unto me, and the rights, permission, privilege, franchise and authority therein referred to." It appeared that subsequent to the execution of the instrument by Townsend, and in and about the year

1889, the American Electric Illuminating Company, in the regular course of its business, duly installed an office and an electric lighting station at 426 East Twenty-Fifth street, borough of Manhattan, in the city of New York, and within said building it installed and operated a comp'ete electric light producing equipment, and in and upon certain streets in the city of New York it strung wires and poles, some of which were erected and owned by it, and others had been formerly erected and used by the East River Electric Light Company and the Thompson-Houston Electric Light Company, and by means of such electrical equipment it supplied to the public electric light under its franchise, grant, permit, license,. and contract to the full extent for which its facilities were equal, and continued so to do for a period of more than one year thereafter, and until its poles, wires, and lamps, together with the poles, wires, and lamps of other companies in the city of New York, were cut down and removed by order of the board of electrical control and the commissioner of public works. It is also alleged that by such action on the part of the city of New York the American Electric Illuminating Company was injured, and its property destroyed, and, there being no electrical subways in that section of the city of New York at that time, it became incapacitated from furnishing its customers in said streets and avenues with electricity for light and all other purposes. Subsequently, and in the year 1897, judgment was obtained against this company. A receiver was appointed, who sold out all the property and rights of the company, and the rights thus sold were acquired by the relator. So far as appears, the relator simply holds whatever right it acquired under the sale by the receiver of the property, franchise, and rights of the American Electric Illuminating Company.

I think there is a serious doubt as to the right of this relator to the franchise granted by the city of New York to the American Electric Manufacturing Company. · Assuming that that company was in possession of a legal franchise to use the streets of the city of New York for its wires, conduits, or conductors, it never formally assigned such franchise to Townsend. I know of no power of the holder of a franchise to grant to an individual a new franchise. While it may be assumed that the owner of a franchise, unless in some way restricted, can assign its franchise, so that, when the assignee has constructed the necessary appliances to use the franchise, his right to operate the franchise wi'l not be interfered with, it does not appear that the owner of a franchise would be authorized to grant to another the right to use the franchise. The American Electric Manufacturing Company by this instrument did not divest itself of the franchise. If it could grant to Townsend the right to exercise the franchise, I can see no reason why it could not give a similar grant to any other person, and thus grant franchises. If such a grant would be sufficient to confer upon the grantee a right to use the franchise granted, there would apparently be two persons authorized to use the franchise, and this might be indefinitely extended to as many persons as the original grantee should desire. What, as I view it, the board of aldermen granted, assuming that their grant was valid, was the power to this corporation, organized under the laws of the state, to exercise a certain franchise.

Certainly that corporation had no authority to grant subfranchises to individuals or corporations to use the streets of the city of New York, without the consent of the state or city.

I also think that this relator is not now in a position to exercise any franchise, even assuming that it had acquired the franchise granted to the American Electric Manufacturing Company. It is not claimed that this relator has acquired the property or plant which the American Electric Illuminating Company operated in the year 1889, or that that plant has been in existence, or can be used by the relator. It claims to have acquired under a sale by a receiver whatever right the American Electric Illuminating Company had at the time that the sequestration proceedings were instituted. Now, the only authority granted by the resolution of the board of aldermen was to place, construct, and use wires, conduits, and conductors for electrical purposes in, over, and under the streets, avenues, wharves, and parks, "according to such plans as may be directed, approved or allowed by and subject to the powers of the electrical subway commissioners." Before this company, or any one having acquired the right of this company to exercise such a franchise, would exercise it, the "plans" must be approved or allowed by the board of electrical control, or those public officers who have succeeded to its duties. It is not given any right to use the streets of New York except in accordance with plans so approved; and, until such plans are approved, no right exists under the resolution to use the streets or operate the franchise. It appears that no such plans have been prepared or approved, and that the relator is not in a position to exercise the franchise, and therefore it seems to me that, the relator having no authority when the application was made to use the franchise, no mandamus could be granted. I think this defendant was entitled to insist that before a mandamus should be granted the relator should show a clear legal right to use the streets of the city of New York under the franchise granted by the board of aldermen.

It appears in opposition to this motion that there are no unoccupied ducts in the streets through which the relator seeks to place its electrical conductors. Under its contract with the city of New York, which has been ratified by the Legislature, the relator is bound to construct ducts in the streets, if unoccupied ducts do not exist when demanded by any corporation or individual entitled to use the streets of the city for electrical conductors. If this mandamus is granted, this corporation will be compelled to construct for the use of the relator electrical conductors, although it does not appear that the relator is authorized to use the ducts when constructed, or will ever be authorized to exercise the franchise to furnish electricity to the public. The rules of the commissioner of water supply, gas, and electricity, who has succeeded to the powers of the board of electrical control, apply only to the permission of a person authorized to use the streets, and have no application to the approval of the plans for the exercise of franchises which, as I read the resolution of the board of aldermen, constituted a condition precedent to the exercise of any franchise. But these rules seem to contemplate an application to the commissioner before the defendant can be required to supply ducts. Rule 1 provides that

no wires, cables, or other electrical conductors shall be placed in any subways, conduits, or ducts now constructed, or hereafter to be constructed, without the written consent of the commissioner of water supply, gas, and electricity being first obtained, and that whenever any duly authorized corporation or person desires or is required to place electrical conductors underground, application must be made to the commissioner of water supply, gas, and electricity, on forms provided for that purpose, for such accommodation as may be desired, and, if the commissioner acts upon such application favorably, he will issue the necessary authorization in the event that the unused facilities of existing subways are insufficient to meet legitimate requirements; and provision is then made for the construction of electrical subways and for the application for space in the subway to be made to the subway company, and it is then provided that, when application has been made and space assigned for conduits underground, the written consent of the commissioner must be obtained before any conductors are placed in the space so assigned. Under these rules it would appear that the right to use the streets must first be approved by the commissioner and the right to apply to the subway company must be predicated upon such approval by the commissioner. To say that the court can grant a mandamus to the subway company requiring it to allow a corporation space in its subway before the commissioner has acted favorably upon an application for a permit for the use of the streets underground seems to me to be a violation of these rules.

I do not think, therefore, that this relator is in a position to ask for this mandamus, and that the court below should have denied the application.

LAUGHLIN, J., concurs.