**STATE OF NEW YORK and Thomas C. Jorling, Commissioner of the New York State Department of Environmental Conservation, Plaintiffs,**

v.

**WESTWOOD–SQUIBB PHARMACEUTICAL CO., INC., and National Fuel Gas Distribution Corporation, Defendants.**

**No. 90–CV–1324C.**

United States District Court,
W.D. New York.

Sept. 25, 1997.

Buchanan Ingersoll Professional Corp., Pittsburgh, PA (Daniel M. Darragh, of counsel), for Westwood–Squibb Pharmaceutical Co., Inc.

Phillips, Lytle, Blaine, Hitchcock & Huber, Buffalo, NY (Robert E. Glanville, of counsel), for National Fuel Gas Dist. Corp.

DECISION and ORDER

CURTIN, District Judge.

### PROCEDURAL HISTORY

In December 1990, the State of New York commenced the present CERCLA action against Westwood–Squibb Pharmaceuticals, Inc. ("Westwood"), as owner of an 8.8 acre parcel of property bounded by Dart Street and Bradley Street in the City of Buffalo. Westwood purchased the parcel from the Iroquois Gas Corporation ("Iroquois") in 1972. During construction and associated soil testing, Westwood discovered various subsurface contaminants. Westwood now seeks to recover the response costs for which it claims National Fuel Gas Distribution Corporation ("National Fuel") is liable.

In an order dated May 21, 1990, the court granted in part and denied in part the parties' cross motions for summary judgment. The court held that there were questions of fact as to whether National Fuel caused Westwood to incur response costs at the site. The court also held that while the New York State doctrine of caveat emptor did not bar Westwood's action, it did bar a common-law private nuisance claim. The court held finally that the contractual relationship between the parties did not preclude National Fuel from raising a CERCLA defense. *Westwood Pharmaceuticals v. Nat. Fuel Gas Dist. Corp.*, 737 F.Supp. 1272 (W.D.N.Y.1990); *reconsideration denied*, 767 F.Supp. 456 (W.D.N.Y.1991), *aff'd*, 964 F.2d 85 (2d Cir. 1992).

In March 1992, a partial settlement was reached. Westwood agreed to perform a remedial investigation and feasibility study of the site. The investigation confirmed the presence of wastes and hazardous substances commonly associated with the coal gas manufacturing operations of the type formerly conducted on the property.

In August 1993, the State amended its complaint to add National Fuel as a defendant. The State then issued a remediation plan. After public hearing and comment, the State, through the Department of Environmental Conservation, issued a Record of Decision ["ROD"] establishing the remedial action to be taken on the site. Item 619.

On November 15, 1994, plaintiffs moved for partial summary judgment against National Fuel. The parties then entered into a consent decree to provide for implementation by National Fuel of the "riparian component" of the remedy specified in the ROD. The riparian component concerns the cleanup of "surface waters and sediments of Scajaquada Creek upstream of the Terrestrial Component to RETEC sample location B–1 and downstream from the Terrestrial Component to the West Avenue bridge and the contaminated sections of the eastern creek bank along the Terrestrial Component." Item 107, p. 5.

On July 7, 1995, plaintiff State of New York and Westwood entered into a consent decree under which Westwood agreed to perform the "terrestrial component" of the ROD. The terrestrial component describes the abatement of waste in the area generally described as "bounded by Dart Street, Bradley Street and the crest of the eastern bank of Scajaquada Creek, including the area to the east of the current fence along Dart Street . . . and the area between the current fence west to the crest of the eastern bank of the creek, and such adjacent areas as are necessary to carry out the remediation specified in the ROD." Item 107, p. 5.

The entry of this consent decree ended the participation of the State in the suit.

National Fuel and Westwood then filed cross claims on the issue of successor liability for the costs of remediation. A trial was held before this court on August 12 and 13, 1996. At trial, Westwood advanced three successor liability theories, and presented three issues to be determined by this court:

(1) Whether, between 1917 and 1921, William Judge acted as agent for National Fuel Gas Company ("NFGC") when he purchased and operated the Buffalo Gas Company ("BGC") assets; and therefore, National Fuel is responsible for any liabilities attributable to Judge's operation of the site;

(2) Whether Niagara Gas Corporation ("Niagara") assumed all of Judge's liabilities associated with his operations at the site, including any CERCLA liabilities attributable to such operations; and, therefore, NFGC, as the successor to Niagara, is responsible for any such CERCLA liabilities; and

(3) Whether the November 25, 1925, foreclosure sale constituted a de facto merger of People's Gas Light and Coke Company ("People's") into Iroquois, with the result that NFGC, as the successor to Iroquois, is responsible for any CERCLA liabilities attributable to People's ownership of the site between 1898 and 1925, and People's operation of the site between 1898 and 1901.

Defendant National Fuel has stipulated that it is the successor by merger to Iroquois and Niagara. In addition, National Fuel has stipulated that it is responsible for any liability that might be imposed on NFGC, its parent corporation.

## BACKGROUND

The events of this case involve a complicated cast of corporations and individuals engaged in a tangled series of transactions stretching back nearly one hundred years. Therefore, a brief explanation of the role of each may be helpful in understanding the relationships which must be addressed in this decision.

### I. The Corporations and Individuals

### A. People's Gas Light and Coke Company

People's was incorporated in December 1897. Westwood Proposed Finding ("PF")

14. People's constructed a Merrifield–Prescott type water gas manufacturing apparatus on the site in 1898, PF 15, and produced gas on the site from 1898 until 1901. PF 17.

## B. Buffalo Gas Company

In 1901, People's leased the site to BGC. BGC was incorporated in 1899 as a consolidation of the Buffalo City Gas Company and the Buffalo Gas Light Company. PF 15. Under the lease, BGC operated the gas manufacturing plant on the site, and kept all proceeds from those operations. PF 17. After the lease was executed, BGC owned and operated all of the gas manufacturing facilities located in Buffalo. PF 18.

The actual lease between People's and BGC has not been found. Westwood trial exhibit 43 sets out the terms of the lease. An attached note states that although the lease was not found, operation of the site by BGC during that period, as well as under succeeding leases, could be construed as acceptance of the arrangement. PF 17; Ex. 43.

The lack of any actual written leases may be explained, at least in part, by the fact that when BGC entered into the arrangement, it already owned 1,920 of the 2,100 People's bonds and 26,824 of 30,000 shares of People's stock. BGC therefore owned over ninety percent of the shares of the company that owned the site it was leasing. PF 16, 17. BGC later acquired an additional 125 People's bonds and an additional 200 shares of People's stock. The identities of the shareholders of the remaining 2,976 shares of People's stock were never determined. Ex. 59. The Buffalo Gas Company—People's entity was purchased by William J. Judge at a receivers' sale in 1917.

## C. National Fuel Gas Company and National Fuel Gas Distribution Corporation

NFGC was organized as a holding company in 1902. In the same year, it purchased the stock of eight natural gas companies, including Buffalo Natural Gas Fuel Company ("BNGFC"). PF 20. The president of BNGFC, W.W. Richardson, commissioned a report on the advisability of acquiring the BGC assets. In July 1912, the report was issued. In November of the same year, BNGFC merged with Iroquois, and Richardson went on to become president of Iroquois.

Walter Jennings was the president of NFGC at the time of the events described. William J. Judge was Vice President and Secretary of NFGC and was a member of the NFGC board of directors. He served as President and Chairman of the Board of NFGC from 1919 until 1943. PF 24. Judge was also proprietor of the Buffalo Gas Company–People's entity from 1917 to 1921.

National Fuel Gas Distribution Corporation ("National Fuel") is a subsidiary of NFGC. Only National Fuel is a defendant in the present action. By stipulation, National Fuel has agreed to be responsible for any liability that may be imposed on NFGC. PF 2.

## D. Niagara Gas Corporation

Niagara was incorporated on April 8, 1921, by members of the law firm that served as counsel to Judge. On April 9, 1921, the day after Niagara's incorporation, the Niagara board of directors authorized the purchase of the People's bonds and BGC assets from Judge for $4 million. PF 38. This price was ultimately reduced to $3 million by the Public Service Commission ("PSC"). Niagara merged into Iroquois just over a year later, in December 1922.

## E. Iroquois Gas Corporation

Iroquois was organized in 1911 and commenced operations in 1912 by acquiring the assets of the BNGFC from NFGC in exchange for Iroquois stock. NFGC ultimately became the majority shareholder of Iroquois. As noted, W.W. Richardson, the president of BNGFC, became president of Iroquois and a member of its board of directors in July, 1912. PF 20A.

In November 1912, Buffalo Natural Gas Company obtained a consulting engineer's appraisal of the BGC assets. The report is addressed to "W.W. Richardson, President, Buffalo Natural Gas Company." Ex. 177. In February 1913, Buffalo Natural Gas Company was dissolved, and the Iroquois stock

was distributed to NFGC. PF 20A. One of the purposes of the report was to evaluate which of the BGC assets could be maintained or improved, and which should be abandoned, in a merger of natural and manufactured gas interests. PF 21; Ex. 177. The report concluded that although the volume of BGC business was disappointing between 1909 and 1912, because natural gas was cheaper at that time than manufactured gas, a merger of the companies would be a wise strategy. Ex. 177.

Three years later, on November 22, 1916, NFGC's board of directors authorized the president of NFGC, Walter Jennings, to acquire the bonds of the former BGC at a price not to exceed 42.5% of par. Exs. 5, 176; PF 23.

### F. L.H. Gethoefer

L.H. Gethoefer was the president of the Pittsburg Trust Company. Pittsburg Trust was at least one of NFGC's primary bankers during the period discussed in this case.

### G. Judge Kenefick

Daniel J. Kenefick was a partner in the law firm of Kenefick, Cook, Mitchell & Bass. He is often referred to in the documents as Judge Kenefick because he had been a New York State judge. In addition to representing Judge and Niagara before the PSC and in various courts, the law firm prepared the deeds and many documents described in detail below. In June 1923, NFGC paid the firm $15,000 in fees related to the acquisition of the BGC property by Judge. PF 37. As noted, members of the law firm were the incorporators of Niagara.

### H. William J. Judge

William J. Judge was an officer of NFGC. In 1917, at the time of the transactions described below, Judge was Vice President of the company. Although National Fuel disputes that Judge was a Vice President at the time of the transaction, Westwood exhibit 141 shows Judge's signature above the title "Vice President" on a document dated June 23, 1917. In addition, Exhibit 133 shows Judge's signature over the title "Secretary" on a document dated July 16, 1917. PF 25B,

Exs. 133, 141. Judge went on to serve as President of NFGC from 1919 to 1943. PF 25, Ex. 28.

### I. W.W. Richardson

Richardson was the president of BNGFC, until the company merged into Iroquois in 1912. After the merger, Richardson became the president of Iroquois, and a member of its board of directors. PF 20A.

### II. The Transactions

At all times relevant to the events described, New York Public Service Commission Law provided that no gas corporation could transfer its works to any person or corporation without approval of the PSC. The law did not, however, prevent such a transfer *by* an individual. The law also provided that a stock company that was not a gas company could not own more than ten percent of the capital stock issued by a gas corporation organized under New York law. N.Y. Pub. Serv. Comm'n L. § 70 (McKinney's 1917), L.1911, ch. 788 § 1, PF 27A. The same law also prohibited a gas corporation from acquiring the stock of any other corporation in a similar business, operating in the same municipality, without permission of the PSC. N.Y. Public Service Comm'n L. § 70.

### A. Judge's Acquisition of the BGC Assets

By 1917, BGC remained an independent corporation manufacturing gas on the leased People's site. The BGC assets included more than 90% of the stock of People's. PF 27C.

On April 18, 1917, NFGC deposited one million dollars with the Pittsburg Trust Company, so that NFGC could begin to acquire 40.5% of the par bonds of BGC. PF 26. NFPF 26. Between April 18 and June 1, 1917, NFGC also borrowed $1,226,000 from Pittsburg Trust. The four notes comprising the loan were ultimately consolidated into a single note. Exs. 131, 141; PF 26. With the $2,226,000 in funds supplied by NFGC, L.H. Gethoefer, the Pittsburg Trust president, acquired BGC bonds with a face value of $5.3

million at 42% of par ($5.3 million × 0.42 = $2,226,000).

On June 15, 1917, the NFGC board authorized Jennings to bid no more than 60% of par for the remaining BGC bonds at the receiver's sale to be held on July 16, 1917. In 1917, NFGC sold an issue of its capital stock to obtain funds to acquire the BGC assets. Ex. 8; PF 25. There is no evidence that Jennings was authorized to bid in his own name, rather than in the name of the company, and there is no authorization for William J. Judge, NFGC vice-president and board member, to bid on the BGC assets on the company's behalf.

National Fuel argues that there is no evidence to support the theory that Gethoefer acted as NFGC's agent to purchase the bonds. Exs. 134, 136, 140, 141; PF 26C. National Fuel Response ("NFR") 26. But at trial, National Fuel's expert witness, Paul Kramer, conceded that Jennings "was using Gethoefer to do what he [Jennings] was asked to do," by the Board. Tr. 356. Kramer agreed with the statement that "the Board made the authority to Mr. Jennings [to purchase the bonds] and left it up to Mr. Jennings as the President of the company as to how best to implement the charge he was given." Tr. 356. Kramer further agreed that "in April of 1917 Mr. Jennings working with Mr. Gethoefer proceeded to go about the charge that he had been given by the Board." Tr. 356. Kramer then acknowledged that by the time of the receiver's sale, NFGC had acquired ninety percent of the BGC bonds through Gethoefer, and that it "appeared" that the bid made by Gethoefer at the receiver's sale was on behalf of NFGC. Tr. 357.

At the July 16, 1917, receiver's sale, Gethoefer acquired the BGC assets using $2,360,000 in BGC bonds that he had already acquired. This amount represented forty percent of the $5.9 million BGC bond issue. To complete the purchase, Gethoefer deposited $5,342,000 in BGC bonds with Carlton Ladd, the Special Master. This left a balance of $558,000 of the original $5.9 million bond issue outstanding. The remaining amount to be paid was $176,000 ($558,000 × 40 percent = $223,000, less the $47,200 deposit at the time of the bid = $176,000), plus an additional $1,000 paid in fees to Carlton Ladd. PF 26D; Ex. 136.

Between July 16 and July 28, 1917, Gethoefer assigned his bid on the BGC assets to William J. Judge. PF 27. In order to fund Judge's acquisition of the assets, NFGC created a loan account for Judge. PF 27. The first memorandum of the Judge Loan Account is a statement dated September 28, 1917, that Judge paid the Special Master the $177,051.50 balance due from the receiver's sale. Exhibit 140 includes a check from NFGC to Judge dated September 28, 1917, for $177,051.50. Ex. 140. By indenture dated October 1, 1917, the BGC assets were conveyed to Judge. Exs. 136, 140; PF 27, NFR 26; Ex. 171.

On October 25, 1917, just over three weeks after the BGC assets were transferred to Judge by the receivers, the NFGC board authorized a guarantee of payment for $35,819. for a new water gas apparatus to be installed at the site. PF 28. NFR 28.

Between September 28 and December 31, 1917, the Judge loan account was increased to a total of $2,561,231.29. This total comprised a number of transactions, including two large transactions of particular significance to the present case. A voucher executed on December 15, 1917, states that NFGC debited the Judge loan account $1,284,800 and credited NFGC's Pittsburg Trust Co. Note Account the same amount. Ex. 140, bottom p. 3. This money was advanced to Judge by NFGC to repay Pittsburg Trust the money borrowed by NFGC to purchase additional bonds after the initial $1,000,000 advance to Gethoefer was exhausted. The interest charged Judge by NFGC on that amount was $41,496.81. Ex. 140, bottom p. 3. On the same date, NFGC debited the Judge loan account $1,042.703.82. This amount represents the original $1 million advance from NFGC to Gethoefer for the acquisition of the BGC bonds, and $42,703.82 in interest and miscellaneous payments to Pittsburg Trust and Gethoefer. Ex. 140, p. 2. At the time of the debit, NFGC charged the Judge loan account $40,894.03 in interest on the advance. NFGC ultimately entered a credit to its Pittsburg Trust Account and a

debit to the Judge loan account in the same amount.

NFGC charged interest totaling $9,197.16 on the total $2.6 million amount of the Judge loan account from September 28, 1917, the date of the first activity in the Judge loan account, until the end of 1917. Ex. 140; PF 30. In addition, $78,403.02 in interest was charged to the Judge loan account for the first six months of 1918. Ex. 150.

On December 31, 1918, NFGC reversed the interest charges to the Judge loan account for 1918 by entering a voucher showing a debit to its interest account. Ex. 178. The voucher indicates that the reason for the reversal was that the PSC would not allow the capitalization of interest on the account for the year 1918. Ex. 178. On December 30, 1920, the $50,091.19 in interest ($40,894.03 + $9,197.16) paid in 1917 was reversed. Ex. 129. The voucher states that these amounts were improperly charged.

After reversing the interest charges for 1917 and 1918, the Judge account was no longer treated as an account receivable for the years 1919 and 1920, the accounting treatment consistent with a loan, but rather was treated as an investment of NFGC. The reasons for the reversal, and the conclusions to be drawn from the changed accounting status, are a central feature of this litigation. The trial testimony concerning these practices is discussed in more detail below.

Interest was charged, capitalized, and debited from the Judge loan account in 1917 and 1918. Tr. 149. In 1917, the Judge loan account was recorded as cash on the NFGC accounting statement. Ex. 154; Tr. 258. In 1918, the Judge loan account was recorded as an account receivable. Ex. 154; Tr. 152, 258. The treatment of the loan account as cash or an account receivable is consistent with the view that the account was a loan. Tr. 258.

Although the interest was charged in 1917 and 1918, there is no definitive memorandum of how much, if any, interest was actually paid. PF 31; Tr. 149; 315. William Rooney testified that although NFGC accounted for interest charged in 1917, "this is strictly from an accounting point of view in which they would have recognized it in profit and loss

... and because they didn't receive it they had to debit that to some asset account, and that's what they did when they charged or capitalized the W.J. Judge loan account." Tr. 149. Paul Kramer testified that although NFGC clearly charged interest on the loan through June 30, 1918, and that some type of payment was made by Judge to NFGC, "there is no indication whether [the amount noted is] a payment on the principal, whether it's interest or what the payment is." Tr. 315. Kramer went on to state: "I assume that they're reductions of the total loan and not interest payments...." Tr. 315.

In 1919 and 1920, the treatment of the loan account changed. On the NFGC final balance sheet for 1919, the loan account is reclassified as an investment of NFGC. Ex. 154; Tr. 155. On the final balance sheet for 1920, the account is also treated as an investment. Id. No interest was charged on the loan account for 1919 and 1920. PF 31, NFR 31.

Throughout the existence of the Judge loan account, NFGC clearly identified the account in its records. A financial audit conducted by the certified public accounting firm of Perine & Nichols for fiscal year 1921 noted that the Judge loan account balance totaled $2,626,715.65, or approximately 7.5% of NFGC's total asset value. Ex. 154. Perine & Nichols did not include any explanation of the nature of the Judge loan account. Id.

At trial, Westwood's expert conceded on cross-examination that if Judge had held such a large loan as an agent of NFGC, the auditors should have insisted that the agency relationship be recorded on the company financial statements. Tr. 260. No such record was ever made. Id.

In testimony before the PSC in 1918, Judge said of the BGC assets that he was "the legal owner with a moral responsibility." PF 33. When asked whether NFGC was the real party in interest in the BGC acquisition, Judge replied: "They have loaned me the money that I have now invested. From their loans I have reimbursed the bank from which I originally borrowed, which was Mr. Gethoeffer's bank." When asked if he was under a legal or moral obligation to turn the property over to the company, Judge answered:

"I am under a moral obligation, I fell [sic] to dispose of the properties as they might elect." Ex. 49, pp. 366–67; PF 33. NFR 33

At a continuation of that proceeding, Kenefick told the PSC: "We frankly admitted he borrowed the money of the National Fuel Gas Company and he feels under a moral obligation, there not being any legal obligation, to turn that plant over to whomever they direct when they get it in shape to know what they want to do with it." Ex. 49, pp. 904–5; PF 33. NFR 33.

During Judge's tenure of the assets, he owned and operated them as a sole proprietorship known as W.J. Judge–Buffalo Gas. Judge and NFGC maintained separate and independent financial books and records and made separate filings with the PSC. National Fuel Ex. 2; Exs. 43, 48, 126. As an unincorporated entity, National Fuel argues that the Judge–BGC assets could not have been officially treated as a subsidiary of NFGC.

There is no record that Judge made any significant investment of capital that was not loaned to him directly by NFGC and debited from the Judge loan account. NFGC guaranteed certain performance and payments by Judge in his acquisition of the BGC assets. PF 35; NFR 35. In June 1923, NFGC paid $15,000 in legal fees to Kenefick, Cook, Mitchell & Bass. These fees were incurred by Judge during his acquisition of the BGC assets. PF 37; NFR 37. Judge did, however, personally enter into contracts, Exs. 7, 15, agree to assume obligations of and indemnify the receivers of BGC, Exs. 55, 56 and 156, obtained an appellate bond, was subject to personal risks in litigation, Exs. 9, 14 and 69, and assumed franchise taxes and local assessments. Ex. 51.

## B. The Transfer to Niagara

On April 9, 1921, the stockholders of Niagara agreed to purchase the BGC assets from Judge for $4 million, subject to the approval of the PSC. Ex. 13; PF 38. The resolution specifically stated that the offer was for all of Judge's BGC assets, including $2,045,00.00 of a par value of a total issue $2,100,000.00 in People's bonds and $2,702,400 of a par value of $3,000,000.00 in People's stock. Ex. 13.

When Niagara, a wholly owned subsidiary of NFGC, sought to acquire the BGC assets held by Judge, both Judge and Niagara made independent applications to the PSC for approval. Neither the submissions to, nor the orders from, the PSC make any reference to a purported agency relationship. Exs. 13–15, 43–48, 51, 53, 55, 56, 82–83, 170; National Fuel Exs. 2, 8–10.

In examining Judge's petition, the staff of the PSC noted that it was unclear how Judge arrived at the $4 million price, given that his proprietorship account amounted to over $15 million. PF 40, Ex. 170. The staff noted that the $15 million included the value of securities, and that there was no data to support the value asserted by Judge. The staff concluded that in the event of a hearing, Judge should be questioned as to what the property actually cost him. *Id.* The PSC subsequently approved the transaction at a price of $3 million. PF 41, Ex. 14. In making its determination, the PSC found that Judge acquired the BGC assets at a foreclosure sale on October 1, 1917, for a total of $2.6 million, and that $379,000 had been spent in permanent additions to equipment and in working capital. Ex. 14; PF 41.

Following the determination of the PSC, Kenefick sent a letter to Judge stating that although Judge could appeal the determination, Kenefick had little hope it would be reversed by the Appellate Division. Kenefick stated:

> While the order is not as favorable as I hoped for, or as I think we were reasonably entitled to, yet under all the circumstances I believe it should be accepted so that we may push ahead without further delay on our larger plans. Of course, we have the right to review the order by certiorari in the Appellate Division but I have little hope that we could succeed in annulling the order. I am inclined to think the court would regard the original purchase as having been made for the National Fuel Gas Company and that the present proceeding was in effect simply a method of changing the form of investment from an account receivable against W.J. Judge to stock of the Niagara Gas Corporation, and looking at it in this aspect would hold

that the Commission was justified in determining that the bid price on the foreclosure was the real value of the property at that time, notwithstanding that evidence was before the Commission indicating a greater value. . . .

Ex. 125; PF 42.

Following the PSC's approval of the transaction, Kenefick also wrote to the PSC on September 13, 1921, to reiterate that the sale was "subject to his [Judge's] liabilities." Kenefick went on to explain that "the transfer of the properties . . . is subject to any liability in excess of $10,000 which may be imposed upon Mr. Judge in the litigation now pending. . . ." Ex. 170; PF 38.[1]

Judge and his wife then conveyed by separate deeds certain of the BGC assets to Niagara, and the remainder of the assets to the Iroquois Building Corporation, another NFGC subsidiary. Neither of the deeds mentions a transfer of the People's stocks and bonds held by Judge, and no other documents were found which memorialize the transfer. Item 135, p. 42.

On October 1, 1921, NFGC executed a voucher entry reflecting its receipt from Judge of all 30,000 shares of the Niagara stock received by him from Niagara for the BGC assets. At the same time, NFGC credited the Judge loan account $2,566,715.65. The voucher entry provides:

> Capital stock (common) of Niagara Gas Corporation by authority of Public Service Commission, New York State for Investment carried under title of "W.J. Judge Loan Account" 30,000 shares of par $100.

PF 46. In addition, the Judge loan account was credited $60,000 for some BGC assets that were transferred to the Iroquois Building Corporation. PF 46 (Ex. 159).

## C. The Transfer to Iroquois and the 1925 Foreclosure Sale

The court now turns its attention to the facts underlying the third question presented by Westwood at trial: Whether the November 25, 1925, foreclosure sale constituted a de facto merger of People's into Iroquois.

In 1916, a lawsuit was commenced by James A. Green, who held thirteen of the People's bonds not acquired by the BGC receivers, and hence not acquired by Judge at the receivers' sale in 1917. Green sought to foreclose on all the People's property, claiming that People's failure to pay interest on the bonds when due made the full amount of the bonds immediately payable. PF 58.

On January 30, 1922, the New York State Supreme Court, Erie County, entered a judgment of foreclosure in favor of Green, giving priority to bond holders other than Judge such that those persons were entitled to payment in full for the full value of their bonds, plus interest, prior to any payment on the bonds held by Judge. PF 58. The judgment of foreclosure ordered that all of the People's property be sold in one parcel at a minimum price of $125,000. PF 59. Pending appeal, Judge was required to post a $125,000 bond. The NFGC board agreed to hold Judge harmless from any loss on the bond. PF 59.

In December 1922, Niagara merged into Iroquois. PF 20A, NFR 20. In 1923, Iroquois settled with Green in exchange for his thirteen bonds. PF 60. After making some additional acquisitions of People's bonds not acquired as part of Niagara's assets, only fifteen of 3,000 People's bonds were not owned by Iroquois in October 1925. PF 67. These bonds remained unaccounted for. Due to the fifteen missing bonds and the 1922 judgment of foreclosure, Iroquois could not obtain fee simple title to the site other than by completion of a foreclosure sale of the People's property. PF 67.

The foreclosure sale of the People's property proceeded on November 24, 1925. Iroquois was the successful bidder in the amount of $375,000. In order to pay the purchase price, Iroquois turned in forty People's bonds and interest coupons acquired from a number of investors. These bonds, with a face value of $83,603.52, were subsequently canceled and destroyed. Iroquois then turned in the 2,045 People's bonds ac-

---

1. The litigation referenced in the letter was at that point before the United States Court of Appeals, and is not otherwise directly relevant to the present action. This is apparently not the *Green* litigation concerning ownership of the People's bonds, discussed in greater detail below.

quired by Judge along with the BGC assets, and transferred by Judge to Niagara as part of the 1921 sale. These were turned in by Iroquois in payment of the $278,396.58 balance due. Of that balance, $38,610 was noted as a reserve to be held for the fifteen missing bonds, as required by a court decree. Each of the bonds was then marked to indicate that $117.26 had been made in partial payment for each, a sum totaling $239,786.58. PF 62.

In 1926, Iroquois petitioned the PSC to allow it to issue capital stock to NFGC in order to raise the $83,603 paid to acquire the forty additional bonds, and the $38,610 for the fifty missing bonds, among other expenses. PF 68. This request was approved by the PSC.

## DISCUSSION

### I. Admissibility of Testimony and Exhibits

#### A. Testimony of Paul Kramer

█ Westwood moves to strike certain testimony of Paul Kramer, National Fuel's expert. Items 134, 136. Westwood moves to strike because during Kramer's deposition, he testified that if William Judge received a bona fide loan from NFGC, the loan would have been reflected on the financial statement of the Judge proprietorship, rather than on his personal books. On direct examination at trial, Kramer stated that while preparing for trial, he became aware of reports indicating that "push down" accounting was not formally adopted by the accounting profession until the early 1980s. "Push down" accounting requires that the disclosure of loan obligations incurred in the purchase of a business be disclosed on the balance sheet of the acquired business. Kramer claimed that because "push down" accounting was not adopted until seventy years after the Judge transactions, the Judge loan would not have been reflected on the statement of the proprietorship.

Westwood claims that National Fuel's conduct violated Fed.R.Civ.P. 26, which requires parties to provide information regarding the subject matter of expert testimony and to "seasonably" supplement that information

with any additional information acquired subsequent to the initial response. Westwood asserts that because National Fuel failed to supplement Kramer's deposition testimony, the court should strike his trial testimony on that issue.

In support of this proposition, Westwood cites *Voegeli v. Lewis*, 568 F.2d 89 (8th Cir. 1977). In that case, an expert changed his opinion at trial from what it had been at his deposition based on two medical articles he read in the interim. Reversing the lower court and granting a new trial, the Eighth Circuit held that "at a minimum [defendant] was required to advise [plaintiff] promptly of [the expert's] change of opinion just as he would have been required to do had answers to interrogatories been filed.... The resulting surprise testimony could only have prejudiced [plaintiffs] in presenting their case." *Id.* at 96.

National Fuel avers that "[a]lthough Mr. Kramer may have suspected several weeks before trial that he had misapplied pushdown accounting principles to the Judge transaction, Mr. Kramer did not complete his investigation and confirm that fact to [National Fuel's] counsel, including the undersigned, until the Thursday (August 8th, 1996) preceding the commencement of trial in this matter on Monday August 12, 1996." Item 144, p. 2. National Fuel also points out that Westwood did not request any additional time to prepare Kramer's cross-examination.

The court finds that Kramer's testimony is admissible, crediting National Fuel's assertion that the expert's error was not confirmed until the eve of trial. Furthermore, the contradictory testimony was skillfully explored by Westwood counsel, who could have asked the court for additional time to prepare cross-examination if necessary. Finally, and most importantly, Westwood was not prejudiced in any meaningful way.

#### B. Testimony of William Rooney

Westwood objected to the qualification of National Fuel's expert, Mr. William Rooney, as an expert on agency relationships, in that Rooney had no legal background and no formal training in agency. Tr. 131–32.

The motion is denied because Rooney's testimony was largely confined to explanations of documents that were before the court, and Rooney was qualified to make these explanations. The court does not rely on any opinion Rooney offered as to whether the documents in evidence establish agency between Judge and NFGC.

## C. Admissibility of Exhibit 177

■ Exhibit 177 is a report submitted in 1912 to W.W. Richardson, then Vice–President and a Director of NFGC and the President of Iroquois. The report is a consulting engineer's appraisal of the BGC assets. One of the purposes of the report was to evaluate which of the BGC assets could be maintained or improved, and which should be abandoned, in a merger of natural and manufactured gas interests. PF 21; Ex. 177. The report concludes that although the volume of BGC business was disappointing between 1909 and 1912, because natural gas was cheaper at that time than manufactured gas, a merger of the companies would be a wise strategy. *Id.*

The document is admitted because it satisfies the requirements of Fed.R.Evid. 901(b)(8) for the ancient document exception to the rule against hearsay. The document is more than twenty years old and was found in the NFGC archives among similar papers, and thus is in a condition which creates no suspicion as to authenticity and was found where one would expect to find such a document.

## D. Admissibility of Exhibit 14

■ Exhibit 14 is an excerpt of the deposition transcript of Mr. Thomas Burns, an accounting employee of NFGC for many years. For the purposes of the court's earlier order on admissibility of exhibits, Westwood agreed that this exhibit was admissible to explain how NFGC kept its accounting records during his tenure with the company. At trial, National Fuel argued that the exhibit was not admissible with regard to testimony about NFGC's record retention system after the end of Burns' employment, because he had no knowledge of how records were kept after he left the company. Tr. 34–35.

The court agrees. Exhibit 14 is admitted for the limited purpose of understanding NFGC's accounting records during the period of Burns's employment from 1957 to his retirement in October 1994. Item 80, Ex. C.

## II. Judge Acted as NFGC's Agent

■ Westwood argues that Judge was acting on behalf of NFGC when he acquired the BGC assets on October 1, 1917, and then operated those assets from October 1, 1917, to October 1, 1921. Restatement (Second) of Agency § 285 cmt. a (1958). Likewise, Westwood contends that Breitman's admission in the pleadings that AM Realty was his agent may help establish that he had agreed that AM Realty would act as his agent. An agency relationship exists where the principal manifests that the agent shall act for him, the agent accepts the undertaking, and the parties understand that the principal is to be in control of the undertaking. *Cabrera v. Jakabovitz,* 24 F.3d 372, 387 (2d Cir.), *cert. denied,* 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994); *Meese v. Miller,* 79 A.D.2d 237, 436 N.Y.S.2d 496 (4th Dept. 1981).

National Fuel counters with three arguments. The first is that evidence establishes that Judge acted on his own behalf, and not as an agent of NFGC. Item 138. The second is that even if Judge purchased the BGC assets as an agent for NFGC, without written authority for the agency, there is no proof of the scope of agency, and therefore no proof that Judge acted within his agency. Finally, National Fuel draws an analogy between the present case and cases examining the CERCLA liability of parent corporations for subsidiaries. National Fuel argues that without proof that NFGC actually participated in the wrongful conduct prohibited by the act, Westwood cannot establish liability.

The court first turns to the nettlesome question of whether the evidence establishes that NFGC had the right to control the manner and method by which Judge operated the assets.

## A. The Minutes of the June 15, 1917 Board Meeting

National Fuel bases a number of arguments on trial exhibit 6, the minutes of the

meeting of the NFGC board of directors on June 15, 1917. At that meeting, the board resolved: "That the President be authorized to make a bid not exceeding sixty (60) per cent of the par value of the outstanding Bonds of Buffalo City Gas Company, which is to be sold at a receiver's sale on July 16, 1917." Ex. 6; PF 26A.

National Fuel first argues that the minutes show that the board felt there was no regulatory impediment to having NFGC acquire the BGC assets directly. Consequently, there was no reason "to resort to some convoluted scheme of having William J. Judge purchase those assets as its secret agent." Tr. 100–01.

Second, National Fuel argues that the minutes show that the board felt it was necessary to formally authorize Jennings to purchase the assets. Therefore, according to National Fuel, the board would also have felt obliged to make a formal authorization for Judge, a NFGC officer, to purchase the assets. *Id.*

Finally, National Fuel points out that neither Judge nor Jennings actually purchased the BGC assets at the receiver's sale. Rather, the assets were purchased by Gethoefer, who assigned the winning bid to Judge, who borrowed the money from Gethoefer's bank to repay NFGC's loan from the same bank. Judge then borrowed money from NFGC to repay Pittsburg Trust.

*According to National Fuel, the Judge agency is "a convoluted scheme. And [National Fuel] submit[s] that if Judge had been acting as National Fuel Gas Company's agent there was no reason why he couldn't have bid in National Fuel Gas Company's name, and certainly there is no reason why he wouldn't take a loan directly from National Fuel Gas Company rather than taking a loan from Pittsburg Trust Company."* Tr. 102. In its post-trial memorandum, National Fuel again argues that there was "no legal, regulatory or apparent business reason for NFGC to acquire the Buffalo Gas assets in the name of an undisclosed agent...." Item 138, p. 32.

The court does not share National Fuel's confusion over the parties' motivation to en-

ter this "convoluted scheme." The Public Service Law arguably prohibited NFGC from making a direct purchase of the BGC assets. Therefore, in order to avoid the scrutiny of the PSC, NFGC had a clear incentive to create the appearance that Judge was acting on his own in acquiring the BGC assets, and not as an agent of NFGC.

In this context, the financing scheme and purchase make complete sense. First, NFGC did, in fact, need a "secret agent" to control and operate the plant. Second, in order to allow a company officer to effectively act as this "secret agent," the company could not make a formal authorization, as such an authorization would signal his role as an agent as opposed to an independent entrepreneur. Finally, Gethoefer would be a necessary intermediary in order to create financial distance between Judge and NFGC, thereby ensuring the success of the plan.

The court credits the argument advanced by National Fuel that if NFGC was going to recruit a truly secret "secret agent" to evade the provisions of the Public Service Law, Judge would have been an unlikely candidate, given his prominence in the company and in the local gas industry. But the court does not believe that the point of the Judge agency was total secrecy. Rather, the point of the agency was to create a sufficiently diffuse financial connection between Judge and NFGC such that the PSC either would not, or could not, inspect the actual paper trail too closely, and would not consider NFGC the legal owner of the assets. Although the court has before it over twenty-five years of financial records, a much more limited record would have been available to the PSC in 1917. The intent of the parties on that date would have been significantly more obscure than it is today.

The court does not find persuasive National Fuel's argument that because the Public Service Law prohibited transfers to a person or corporation without the permission of the PSC, even the transfer to Judge would have required the approval of the PSC. Item 145, p. 9. The court rejects this argument because the statutory language is more complicated than National Fuel suggests.

The statute provided that no gas corporation could transfer its works to any person or corporation without the permission of the PSC. But the statute did not prohibit a transfer *by* an individual. PF 27A; Public Service Commission Law, § 70, note at bottom of p. 91, *citing, Matter of Long Acre Electric Light & Power Co.*[2] This may be the reason Gethoefer was involved. Technically, Judge received his interest in the property from an individual, Gethoefer, and, therefore, was in compliance with the law. This scenario begs the question of whether Gethoefer's acquisition was legal under the meaning of the statute, but the language cited by National Fuel does not defeat the purpose of Judge's agency.

The court notes here that the existence of a sound theory to explain the "convoluted scheme" does not mean, by itself, that the scheme existed or was actually put into action. However, this is a plausible explanation why the parties might have engaged in the conduct alleged.

## B. The Judge Loan Account

The most significant circumstantial evidence of whether Judge acted on his own behalf or as the agent of NFGC is the treatment by the parties of the Judge loan account. According to Westwood, the loan account was simply a paper transaction allowing NFGC to evade the ownership restrictions of the Public Service Law. Westwood argues that during the periods when Judge was charged interest, that interest was never actually paid, and the reversal of the interest charges was required by outside auditors who understood the transaction was an investment, and thereby directed that the interest charges were improper.

National Fuel counters that when the interest charges were in effect, it was perfectly appropriate for NFGC not to collect the money from Judge, but rather to capitalize the interest by adding it to the balance of the Judge loan account. It also argues that it is unclear why the interest charges were actually reversed, and that any number of explanations are plausible. According to National Fuel, these other explanations defeat Westwood's efforts to sustain its burden of proof.

### 1. Rooney Testimony

Westwood's expert, William Rooney, testified at trial that beginning in 1919, the Judge account was treated as an investment of NFGC. Tr. 155–56. Rooney further testified that the change was probably due to the fact that the books had been audited by an outside accounting agency for the period June 1, 1919, through December 31, 1920, and that the accountants understood the BGC acquisition to be a direct investment by NFGC. Tr. 157.

Rooney then opined that had he been an auditor examining NFGC's books, and been told by the company that its interest in BGC was an investment, he would have reversed the interest amounts charged to Judge, because, in effect, NFGC was improperly charging itself interest on an investment it made in BGC. Tr. 161. He said that just such a reversal of the interest accounts is reflected in exhibit 129. Tr. 160. Exhibit 129 is a "Credit or Cross Entry Voucher" dated December 31, 1920. The voucher states that it reverses the interest amounts of $40,894.03 and $9,197.16 charged to the Judge account in 1917. Finally, Rooney testified that Judge's own balance sheet from the BGC plant dated December 31, 1920, did not show the approximately $2.8 million loan liability to NFGC. Tr. 172; Ex.170.

---

2. In *In re Long Acre*, the court held:

It is also submitted in objection that the consent of the gas commissioner to the assignment from Minturn to the Long Acre Company was not obtained. To support this objection reference is made to section 13, c. 737, p. 2097, of the Laws of 1905. But said section prohibits a corporation transferring or leasing its franchise or other property to any other person or corporation, and contains no prohibition of such transfer by an individual.

51 Misc. 407, 101 N.Y.S. 460 (1907), *aff'd*, 117 A.D. 80, 102 N.Y.S. 242, *aff'd*, 188 N.Y. 361, 80 N.E. 1101 (1907).

The court went on to approve the transfer. This court notes that the citation provided by the *Long Acre* court does correspond to the Laws of 1910 cited above; however, the *Long Acre* case is provided as an annotation to the text of the Laws of 1910.

On cross-examination, Rooney agreed that if he had been working for Perine & Nichols, the independent auditors, and was told that Judge held the assets as an agent of NFGC, he would have insisted that some statement concerning that relationship be included, and that there was no such statement by the auditors. Tr. 260.

He said that the reversal of the interest amounts did not all occur in 1920. Referred to exhibit 178, Rooney agreed that in fact the first reversal had occurred in 1918. Tr. 262. Ex. 178. Exhibit 178 is a "Credit or Cross Entry Voucher" dated December 31, 1918. It states that because "it is now believed that the Public Service Commission ... will not allow the capitalization of interest applying to the year 1918 on W.J. Judge Loan Account, the entry for interest from January 1st to June 30th ... is hereby reversed." Rooney acknowledged that this reversal occurred well before the Perine & Nichols audit and that he did not know what procedures or policies of the PSC might have changed to cause the reversals. Tr. 264.

Westwood points out correctly that the par value of the Niagara shares tendered by Judge was some $350,000 more than the amount of the loan account, and that Judge was not paid for the extra shares, but rather the loan amount was simply discharged. Tr. 84. National Fuel's expert stated at trial that there were two possible explanations for this discrepancy. The first was that the actual value of the BGC plant was really not known, and the second was that the surplus was paid to NFGC in compensation for the period when they were not allowed to charge interest on the loan. Tr. 330.

## 2. Kramer Testimony

National Fuel's expert, Paul Kramer, testified that there was evidence that NFGC had charged Judge interest on the loan, and that Judge had in fact repaid over $100,000 in principal in 1919 and 1920. Kramer did not specify the documents on which he relied in coming to this conclusion and pointed to no other evidence that any interest was ever paid by Judge. Tr. 315.

He also said that prior to the reversals described above, NFGC did charge Judge six percent interest from January through June 1918. Tr. 315. Kramer also testified that given the size of the loan, there should have been some statement as to its validity, collectibility, and security. Tr. 318. In addition, Kramer stated that the change in reporting of the loan from an account receivable to an asset was not significant, because during that period NFGC made numerous changes to its financial reporting. Tr. 319.

Kramer testified further that Judge had earned income from the operation of the BGC plant during his tenure of the assets. Tr. 323–24. On cross examination, however, Kramer was presented with National Fuel exhibit 10, which is Judge's petition to the PSC for consent to transfer the BGC assets to Niagara. Tr. 338. In the petition, Judge's counsel maintains that for the three and a quarter years beginning October 1, 1917, and ending December 31, 1920, Judge had no return on his investment. Tr. 340. Kramer stated that he had not reviewed that paragraph before, and conceded that it was inconsistent with National Fuel Exhibit 3, which is an "income account" for the years 1919 through 1921. Kramer had based his testimony that Judge earned up to $200,000 at least in part on Exhibit 3. Tr. 337. Kramer then conceded that Exhibit 3 does not have Judge's name on it, and that he did not know why the document was prepared or what its purpose was. Tr. 342.

The court concludes that taken together, the documents described are strong evidence that Judge acted as NFGC's agent. The Public Service Law created a motive for NFGC to create the appearance of an arm's length transaction. There is no evidence that Judge invested a dime of his own money in the acquisition, and no clear evidence that he made any significant return on the borrowed money during his stewardship of the assets. Shortly after the acquisition, NFGC paid directly for the water gas apparatus installed at the plant. Although National Fuel's expert took pains to state that the reversal of the interest charges and reclassification of the loan account from an account receivable to an investment could be for any number of reasons, the most plausible explanation is that either the independent auditor,

the PSC, or both, simply came to the conclusion that the loan account was not a loan, but rather was an investment. In addition, although there is evidence that loan repayments were capitalized and that interest was charged for some periods, there is no indication that Judge actually paid any of these amounts. Finally, the fact that this convoluted series of transactions took place is evidence that Judge was acting as NFGC's agent. If, as National Fuel claims, such a "secret agency" was not necessary, why wouldn't NFGC have purchased the site directly? If Judge were acting independently, why wouldn't he simply have gone to Gethoefer himself to arrange the financing?

## C. The Blank Deed

Westwood offers an "indenture" made on October 16, 1917, between Judge and his wife as parties of the first part and an unspecified party of the second part. Ex.52. PF 34. The indenture refers to an assignment to an unspecified second party of all of the BGC assets acquired by Judge on October 1, 1917. The document was prepared by the law firm of Kenefick, Cook, Mitchell & Bass, was executed by Judge and his wife, and was notarized.

According to Westwood, by holding this document, NFGC could have assigned all of the BGC assets to itself or any other nominee at any time after the execution of the document. Westwood's expert at trial, Mr. William Rooney, testified that the execution of the blank assignment indicated that, in effect, the bearer had title to the described assets. Tr. 178. Although Rooney's testimony is of some value, the court notes that Rooney is not a lawyer and is not an expert on real property law. The court consequently gives only slight weight to this testimony.

National Fuel makes a number of objections to the proposed finding, noting that there is no evidence that the indenture was delivered to NFGC, though it was found among the company's records. More important, National Fuel argues that if the court were to find that the indenture was delivered to NFGC, such an arrangement is consistent with an arrangement in which Judge borrowed the money to buy the BGC properties,

offered the indenture as security for the loan, and NFGC held the note as a deed in trust in the event of a default.

First, it is more likely than not that NFGC was the party of the second part. The document was found among NFGC's records, and was executed shortly after NFGC loaned Judge the money to buy the BGC assets. There is no indication that Judge owed any significant amount of money to any other party at that time, and hence there is no other plausible explanation for the indenture.

In addition, the fact that NFGC might in theory have taken the property at any time by executing the deed is not necessarily inconsistent with the theory that Judge was acting as NFGC's agent. It is difficult to believe that Judge would have executed the blank deed if he were engaged in an arm's-length transaction. It is more plausible to suppose that Judge would only endorse such an instrument if he was following the instructions of NFGC.

Although the deed is by no means conclusive proof, it shall be considered as some evidence of agency between Judge and NFGC.

## D. The Judge and Kenefick Testimony

National Fuel emphasizes the cryptic testimony of Judge himself before the PSC. Tr. 104–05, Ex.49. Judge stated that although he did not believe that he was under any legal obligation to dispose of the BGC assets as NFGC directed, he did feel that he was under a moral obligation to do so because NFGC had loaned him the money to purchase the assets.

There is also the testimony of Daniel Kenefick before the PSC where he said "We frankly admitted he borrowed the money of the National Fuel Gas Company and he feels under a moral obligation, there not being any legal obligation, to turn that plant over to whomever they direct when they get it in shape to know what to do with it." Ex. 49, pp. 904–05; PF 33. NFR 33. National Fuel contends that the court cannot conclude that Judge acted as NFGC's agent unless the court concludes that both Judge and Kenefick perjured themselves before the PSC.

This conclusion does not necessarily follow. In their testimony, Judge and Kenefick simply stated their opinions as to the nature of Judge's legal obligations to NFGC; neither man gave any factual testimony in the excerpted testimony. Having concluded that he had no legal obligation, Judge offered that he felt a moral obligation. The court credits the integrity of both men's sincere belief in their opinions, but that does not mean they were correct. It is for this court to decide whether the transactions described gave rise to a legal agency between NFGC and Judge. The court need not find that either Kenefick or Judge lied in order to find agency. The court only disagrees with their opinions as to Judge's obligation to NFGC.

### E. The Consolidated Tax Returns

In addition, the question of whether the Judge entity was included in the NFGC consolidated tax findings is also a significant source of controversy in the present action. Westwood argues that NFGC included the Judge entity in its returns, and that under the Internal Revenue Act of 1918, section 240(b), the Judge property would only qualify for such treatment if it were controlled by NFGC. National Fuel counters that in fact there is no evidence that NFGC actually made any payments on behalf of the Judge entities or that NFGC included the unincorporated Judge entity on any of its returns until 1938.

During part of the period covered by the consolidated returns, the assets were owned by Niagara and Iroquois. Tr. 209–10. In addition, there is no evidence that any tax payments were made on behalf of Judge in 1917, 1918, or 1919. Tr. 271. Rooney conceded on cross-examination that there is no way to know what arrangements, if any, might have been made between NFGC and Judge to assume future tax liabilities, and that there might have been an agreement that any such liabilities would be borne by the buyer and not the seller. Tr. 209–10. In addition, Rooney acknowledged that there was no evidence that any tax was ever paid by NFGC on behalf of Judge as proprietor of the assets. Tr. 291.

Given this testimony, the court finds the consolidated tax return record inconclusive. There are simply too many questions that cannot be answered so many years later to conclude that NFGC actually made consolidated tax payments on behalf of BGC during the Judge proprietorship.

### F. The Kenefick Letter of September 10, 1921

The court finds that the letter from Kenefick to Judge of September 10, 1921, supports Westwood's premise that it supports an inference that an outside party might conclude that Judge was an agent for NFGC. *Supra*, pp. 777–78. Tr. 250. PF 42. It was Kenefick's duty as Judge's attorney to offer a frank assessment of how the Appellate Division was likely to view the case. Although not conclusive, Kenefick's view that an outside party might conclude that Judge was an agent is some evidence that such a relationship existed.

### G. Miscellaneous Factors

National Fuel relies upon exhibit 43, in which an accountant in the PSC wrote a memo to the Chief of the Accounting Division, stating that BGC was legally a distinct entity from NFGC. Tr. 233. It also elicited testimony intending to show that the Judge entity was a sole proprietorship, and consequently NFGC could not have been a parent corporation of the Judge entity. Tr. 206.

Westwood calls attention to exhibit 14, the minutes of a meeting of Niagara's Board of Directors in 1921, in which there was recognition by Niagara that Judge was the purchaser and operator of the BGC assets. Tr. 241. PF 41.

None of this evidence is particularly persuasive. There is no dispute that BGC was a separate corporate entity from NFGC at the time of the Accounting Division report. The issue is whether, despite the corporate formalities, BGC was controlled by NFGC through Judge as an agent. Similarly, there is no dispute that Judge purchased and operated the assets; again, the issue is whether he acted on his own or as an agent. Finally, as noted above, the tax records could not be thoroughly and consistently explained at tri-

al, and hence are inconclusive proof of the proprietorship status.

## H. Conclusion

■ So many years after the transaction in question, there are many holes in the factual record that simply cannot be explained. Counsel for National Fuel has done a very capable job of exposing inconsistencies in the record. But having said that, Westwood has carried its burden of proof and demonstrated that Judge acted as an agent of NFGC. In addition to the evidence discussed in detail there are additional factors which lead to a finding of agency. The first is the existence of the Public Service Law. Whether or not the law actually barred NFGC's acquisition of the BGC assets is open to debate, but it certainly would have triggered a hearing. Whatever the outcome of that hearing, the process would have been time-consuming and expensive. It was clearly much easier to have Judge acquire the assets, nominally for himself.

The second factor is the nature of the transactions that lead to Judge's acquisition of the assets. National Fuel offers no explanation as to why the parties would have undertaken this labyrinthine path but for the motive outlined above. There is no explanation why NFGC would have lent some 7.5% of its total assets to start an independent business potentially in competition with its own interests. If NFGC had no objection to Judge striking out on his own, there is no reason he could not have gone to Gethoefer himself for the loan. Certainly, a NFGC senior officer and one of the company's principal bankers must have known each other. If Judge were acting on his own behalf, what motive did NFGC have to provide him money to operate the plant after the initial acquisition, especially in light of the fact that the company was not allowed to charge Judge interest for much of the life of the transactions.

Put simply, the likely motivation to avoid complications before the PSC, coupled with the nature of the transaction itself, leads the court to conclude that Westwood has established that it is more likely than not that

Judge acted as NFGC's agent in the operation of the BGC.

## I. Scope of Agency

■ Having determined that Judge acted as NFGC's agent, the court turns to National Fuel's two additional arguments: that Judge acted outside the scope of his agency, and that NFGC was not liable as a parent for the acts of Judge as its subsidiary.

The funding of the BGC operations during Judge's tenure came almost entirely from NFGC. NFGC's consistent and ready funding of Judge's operations at the site is conclusive proof that at no time did Judge act outside the scope of his agency in simply operating the BGC assets. If Judge had at any time acted beyond his agency with NFGC, the company would not have provided Judge with a constant stream of funding. Given that the waste from these assets were an expected and normal by-product of operation, it defies common sense to conclude that they were generated outside the scope of Judge's agency.

Second, even if the court were to accept National Fuel's parent-subsidiary analogy, it would still find liability. At all times during his stewardship of the BGC assets, Judge was a senior corporate officer of NFGC, who felt a "moral obligation" to do as NFGC directed. The court cannot therefore conclude that if Judge acted as NFGC's agent, NFGC did not "exercise actual and pervasive control of the subsidiary."

## III. Iroquois is a Successor to People's Under the De Facto Merger Doctrine

### A. The *Arnold Graphics* Test Applies

■ "The general rule is that where a company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor." 15 FLETCHER CYCLOPEDIA CORPORATIONS § 7122. There are four exceptions to this rule: (1) the successor expressly or impliedly agrees to assume the liability of the predecessor; (2) the transaction is a de facto merger or consolidation; (3) the successor is a "mere continuation" of the predecessor; or (4) the transaction is fraudulent. *B.F. Good-*

*rich v. Betkoski,* 99 F.3d 505, 518 (2d Cir. 1996).

Throughout its post-trial submissions, Westwood has argued that Iroquois was a successor to People's under the de facto merger exception. See Items 135, 141. National Fuel made a preemptive argument, that New York state law applied to successor liability issues. According to National Fuel, although New York state law recognized the de facto merger doctrine, it did not recognize an additional doctrine developed under federal common law, called the "substantial continuity" doctrine. Item 138, p. 70.

National Fuel's argument was perhaps necessary in light of the fact that some courts have treated the "substantial continuity" doctrine as simply a broadening of the "mere continuation" exception. *See, Kleen Laundry & Dry Clng. v. Total Waste Management,* 867 F.Supp. 1136, 1140 (D.N.H. 1994). Other courts have indicated that the doctrine involves factors which are similar to those considered in a de facto merger evaluation. *State of New York v. N. Storonske Cooperage Co., Inc.,* 174 B.R. 366, 387 (N.D.N.Y.1994). Nevertheless, all courts have treated the doctrines separately.

The Second Circuit Court of Appeals clarified the law, at least in this circuit, in *Betkoski.* The court employed the "substantial continuity" test not as an independent fifth exception, but rather as the test for determining liability under the established "mere continuation" exception. Specifically, the *Betkoski* court held:

> The [parties] contend that when determining whether there is a "mere continuation," we should not use the common law test ... which requires the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and the predecessor corporations. Rather, they urge that we employ the "continuity of enterprise" approach, also called the

"substantial continuity" rule. The Supreme Court has followed this approach in the labor law context by asking if the successor maintains the same business, with the same employees doing the same job, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers.

*Betkoski,* 99 F.3d 505 at 519.

This court concludes that *Betkoski* stands for two propositions: that federal common law applies to CERCLA liability in this circuit and that the substantial continuity test applies to an analysis of the "mere continuation" exception. The court finds nothing in *Betkoski* which upsets the de facto merger test widely employed in this circuit.[3]

■ A de facto merger makes the surviving corporation liable for the claims against the predecessor. *Arnold Graphics Indus. v. Independent Agent Ctr.,* 775 F.2d 38, 42 (2d Cir.1985). A de facto merger occurs when one corporation is absorbed by another without compliance with the statutory requirements for a merger. 15 FLETCHER CYCLOPEDIA CORPORATIONS § 7124.20.

The *Arnold Graphics* court identified four factors relevant to a determination of whether a de facto merger had occurred: (1) the continuation of the enterprise of the selling corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations; (2) a continuity of shareholders which results from the purchasing corporation paying for the assets with its own stock, so that the shareholders of the seller become constituents of the purchaser; (3) a dissolution of the seller, and (4) the purchaser's assumption of the obligations of the seller ordinarily necessary for the continuation of the business of the seller. *Arnold Graphics,* 775 F.2d at 42; FLETCHER CYCLOPEDIA CORPORATIONS § 7124.20. The *Arnold Graphics* court also

**3.** It should be noted that National Fuel never directly challenged the argument that *Betkoski* applies. In its Post Trial Reply Memo, Item 145, it simply argued that Westwood should not be allowed to rely upon *Betkoski* because it did not advance the *Betkoski* argument in its original memo. Item 145, p. 32 n. 6. The first round of memos were filed on November 7, 1996; *Betkoski* was decided on November 1, 1996, and the reply memorandum was filed on December 9, 1996.

ruled that all of these factors "must" be satisfied. *Arnold Graphics*, 775 F.2d at 42.

■ The court notes that although *Arnold Graphics* governs the de facto merger analysis in this circuit, the case was not decided in the CERCLA context. Consequently, although this court will require the plaintiff to meet all four elements of the test, the court will not afford undue respect to corporate formalities as to its evaluation of each prong. As one court noted:

> [S]trict adherence to the parochial requirements in CERCLA cases may in some instances conflict with the remedial policies underlying [CERCLA]. Therefore, the court will adopt a common sense rather than an overly restricted look at the corporate transfer.... The pragmatic approach does not repudiate the factors regularly used to determine questions of corporate successorship under the de facto merger or 'mere continuation' exceptions. Rather, the court considers the traditional doctrine in a somewhat more flexible manner in order to promote the broad remedial policies underlying CERCLA

*Kleen Laundry*, 867 F.Supp. at 1141, citing *United States v. Kayser-Roth Corp.*, 910 F.2d 24, 26 (1st Cir.1990), *cert. denied*, 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991) (quotations omitted); *Smith Land & Improv. Corp. v. Celotex Corp.*, 851 F.2d 86, 91–92 (3d Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989); See, *In re Acushnet River and New Bedford Harbor*, 712 F.Supp. 1010, 1015 (D.Mass. 1989).

### B. Application of the *Arnold Graphics* Test

Westwood argues that it need only show that the 1925 foreclosure sale constituted a de facto merger of People's into Iroquois. See, Questions Presented at Trial, *supra*, p. 772. National Fuel counters validly that if the purchase of the People's bonds amounted to an assumption of People's liabilities for the purposes of the de facto merger doctrine, then People's underwent a de facto merger with BGC in 1899, and was not still available to merge again in either 1917 or 1925. Item 138, p. 68.

The court agrees with this analysis, but does not believe it adequately addresses the reality of the transactions between People's, BGC, Niagara, and Iroquois. The court therefore addresses the problem as two mergers: one between BGC and Niagara when Niagara purchased BGC from Judge in 1921, and the other between People's and Iroquois at the time of the 1925 foreclosure sale.

Both parties have discussed these component transactions at length. The court will evaluate these arguments to determine whether the combination of the BGC acquisition of the People's stock and bonds in 1899, the lease of the site from People's to BGC in 1901, the acquisition of BGC on behalf of NFGC by Judge in 1917, the sale of BGC to Niagara in 1921, the merger of Niagara into Iroquois in 1922, and the foreclosure sale of the People's bonds to Iroquois in 1925 made Iroquois a successor to People's for the purpose of CERCLA liability.

### 1. BGC Merged into Niagara

National Fuel argues that by the time of the 1925 foreclosure sale, People's had not conducted any operations on the site for twenty-four years, and hence Westwood cannot complete the successor chain from People's to Iroquois. This argument ignores a significant peculiarity of the People's–BGC relationship. As noted, when BGC leased the People's site in 1901, BGC already owned 1,920 of the 2,100 People's bonds and 26,824 of 30,000 shares of People's stock. BGC therefore owned over ninety percent of the bonds and eighty-nine percent of the stock of the company that owned the site it was leasing. PF 16, 17. This created an awkward corporate sandwich, with People's at the center and BGC as both the owner and lessee of the site.

CERCLA defines a "person" as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity ... or any interstate body." 42 U.S.C. § 9601(21). The relationship between People's and BGC at the time of the 1901 lease was most closely analogous to a joint venture. While People's remained a sepa-

rate entity from BGC, in practice the two operated as units of the same gas manufacturing plant.

Although the arrangement between People's and BGC may not technically qualify as a joint venture, the court is mindful of the admonition that it should refrain from an overly formal respect for corporate form that ignores reality and defeats the goals of CERCLA.

The court therefore finds that BGC and People's operated a joint venture from 1901 until the transfer to Iroquois in 1925. During that period, the companies were a single "person" for the purpose of CERCLA liability, and their actions are attributable to NFGC, on whose behalf Judge operated the plant. Therefore, although the court finds no de facto merger between BGC and People's, the court does find that People's role as lessor of BGC assets, under the specific facts of this case, amounted to continuous operation both as a leasing company and as joint operator of the gas manufacturing facilities on the site.

### a. Continuation of Selling Corporation

National Fuel argues that there is no evidence of continuity of management or employees between People's and Niagara, and that Westwood has not described the operations on the site immediately before or after the 1921 transfer with sufficient specificity to support a finding of continuity.

National Fuel is correct that there is no comprehensive roster of production workers or line management who worked at the site. But, the People's–BGC plant was owned by Judge, acting as an agent of NFGC, prior to the acquisition by Niagara in 1921. Niagara was a corporation formed by Judge's lawyers. The fact that Niagara acquired the People's–BGC entity on April 9, 1921, a day after its incorporation on April 8, 1921, leads the court to conclude that Niagara was formed to acquire the gas plant. PF 38. Just over a year later, Niagara merged into Iroquois. The court finds that although the formal shareholders may not have been identical, the People's–BGC entity was, in fact, under NFGC's control throughout this period.

Similarly, there was a continuity of the assets. National Fuel argues that the lack of a detailed description of the property, and the transfer of a portion of the property to the Iroquois Building Corp. defeats Westwood's argument as to this requirement. But again, the main portion of the site was transferred from Judge, as agent of NFGC, to Niagara, a corporation under NFGC's control. A small portion of the property went to the Iroquois Building Corp., a subsidiary of Iroquois. NFGC became the majority shareholder of Iroquois in 1912, and Niagara merged into Iroquois in 1922. Again, the property simply moved from one NFGC-controlled entity to another.

### b. Continuity of Shareholders

A number of courts have identified continuity of shareholders as the most critical, though not the dispositive, factor in making a determination of de facto merger. In fact, New York law requires that continuity of shareholders be accomplished by paying for the acquired corporation with shares of stock. *Arnold Graphics*, 775 F.2d at 42.

National Fuel argues:

Westwood cannot establish a continuity of shareholders from the W.J. Judge–Buffalo Gas entity to Niagara. Neither can Westwood establish any identity between the "owners" (rather than the shareholders) of the W.J. Judge–Buffalo Gas entity and Niagara. The Buffalo Gas assets were owned by Mr. Judge, individually. Niagara's stock was primarily held by NFGC. It also follows that ... because the W.J. Judge–Buffalo Gas entity was unincorporated, there was no immediate dissolution of the Judge entity following the asset sale.

Item 138, p. 51.

Westwood has established the requisite continuity of shareholders. Niagara tendered 30,000 shares of its stock to Judge, who was acting as agent of NFGC at the time of the transfer. Niagara was, as National Fuel concedes, "primarily held" by NFGC. Although there is disagreement as to whether Judge actually turned over the

shares to NFGC, NFGC credited the Judge loan account $2,566,715.65.

Consequently, the BGC assets were transferred from the ownership of NFGC's agent to the ownership of a NFGC subsidiary. Although National Fuel argues that Judge technically held the assets as a sole proprietorship and therefore had no shareholders, the court finds that the nature of his agency satisfies the more relaxed substantial continuity test.

In addition, courts in similar cases have attributed the liability of the subsidiary directly to the parent. For example, in *United States v. Kayser–Roth Corp.*, 724 F.Supp. 15, 21 (D.R.I.1989), *aff'd*, 910 F.2d 24 (1990), *cert. denied*, 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991), the court held that the parent corporation must exercise its power or capacity to control its subsidiary in order to be held liable under Section 107(a). The court held Kayser–Roth, the parent corporation, liable as an owner and operator, based on evidence adduced at trial which established that Kayser–Roth (1) had total monetary control over its subsidiary accounts receivable, (2) placed restrictions on its subsidiary's financial budget, (3) controlled its subsidiary's contact with the government on environmental matters, (4) approved all of its subsidiary's capital expenditures in excess of $5,000 and real estate transactions, and (5) placed its own personnel in its subsidiary's officer and director positions.

As discussed in detail above, NFGC had control over Judge's budget, and in fact directly lent the money for most, if not all, his ongoing expenses, as well as for capital improvement to the site. National Fuel may therefore be held liable for any activities on the site during Judge's tenure.

#### c. Dissolution of the Seller

■ Once Judge transferred the BGC assets to Niagara, he ceased to operate his sole proprietorship as an entity distinct from NFGC. As already noted, it was really Judge, as owner of BGC, and not People's, that was the seller of the assets.

#### d. Assumption of Seller's Obligations

■ The *Arnold Graphics* court required a showing that there was an assumption by the purchaser of essentially all of the liabilities of the seller. 775 F.2d at 42. There is significant evidence that Niagara intended to assume Judge's obligations and liabilities. At their April 9, 1921, meeting, the Niagara stockholders adopted a resolution which provided in part: "RESOLVED, that the Niagara Gas Corporation hereby accepts the offer of William J. Judge to sell and transfer to this corporation his gas franchises, works and system, including his quick assets and subject to his liabilities...." Ex. 13. PF 38.

National Fuel argues persuasively that Niagara did not expressly assume all of Judge's liabilities, and therefore cannot be said to have assumed his CERCLA liability. National Fuel points to the fact that at an October 13, 1921, board meeting, Niagara specifically agreed to assume certain liabilities arising out of any accident to an employee at the site prior to the date of transfer. Ex. 16. Sixteen years later, NFGC, as parent to Iroquois, successor to Niagara, agreed to assume certain · tax liabilities. Ex. 10. According to National Fuel, had the initial resolution been meant as an assumption of all liability, no further discussion of the issue would have been necessary.

The court finds that the language of the resolution is insufficiently specific to include some uncontemplated future environmental liability. For that reason, the court does not agree with the Westwood hypothesis that Niagara made an express assumption of Judge's CERCLA liability.

Nevertheless, the language is specific enough to include "essentially all" the regular liabilities and obligations of running the business foreseeable at the time of the transfer. The initial resolution called for acceptance of the transfer subject to Judge's liabilities. That later documents record amplifications to that assumption is not inconsistent with this conclusion.

#### 2. People's Merged into Iroquois

As noted above, Niagara merged into Iroquois in 1922. Although the court has found

that BGC and People's were inseparable as a practical matter for the operation of the gas manufacturing facility, People's continued to exist as an independent paper corporation. After making some additional acquisitions of People's bonds not acquired as part of Niagara's assets, only fifteen of 3,000 People's bonds were not owned by Iroquois in October 1925. These bonds remained unaccounted for. Due to a 1922 judgment of foreclosure, Iroquois could not obtain fee simple title to the site other than by completion of a foreclosure sale. PF 67.

The foreclosure sale proceeded on November 24, 1925. Iroquois was the successful bidder in the amount of $375,000. In order to pay the purchase price, Iroquois turned in forty People's bonds and interest coupons acquired from a number of investors. These bonds, with a face value of $83,603.52, were subsequently canceled and destroyed. Iroquois then turned in the 2,045 People's bonds acquired by Judge along with the BGC assets, and transferred by Judge to Niagara as part of the 1921 sale. PF 62.

National Fuel's principal argument is that there is no authority that can support a finding of successor liability based on an asset purchase at a foreclosure sale. According to National Fuel, "such a holding ... would have a profoundly negative impact on the credit market because creditors could not expect to realize much value from their security if potential asset purchasers could be saddled with the debtor's liabilities." Item 138, p. 52.

The court's holding in this case will not disrupt the credit markets, because the facts are unique. This is not an arms length transaction between a debtor/seller and an asset purchaser at an ordinary foreclosure. In this case, Iroquois already owned over ninety-nine percent of the existing BGC bonds. In order to gain fee simple title, Iroquois had to conduct the sale, and essentially purchase the property from itself.

### a. Continuity of Shareholders

 Westwood concedes that Iroquois used none of its stock to acquire the People's assets at the foreclosure sale. Rather, Westwood states that Iroquois owned ninety-nine percent of People's stock prior to the foreclosure sale, but that this stock was worthless. Westwood argues that because Iroquois owned all the stock in both the selling and the purchasing corporation, continuity of shareholders was met automatically when the asset sale occurred. Item 135, pp. 50–51.

National Fuel argues that regardless of whether Iroquois owned the People's stock, the fact that it did not acquire the assets by transferring its own stock means that it did not comply with the basic requirement for continuity of shareholders. It argues that although Judge transferred the People's bonds to Niagara, there is no evidence that he transferred the stock, and therefore no evidence that Iroquois held the stock prior to the receiver's sale. National Fuel further argues that Judge held the People's stock until People's was dissolved by the Secretary of State in 1932, Item 138, p. 67, that some of the People's stock was unaccounted for, and finally that Westwood cannot prove that NFGC controlled People's through Judge while simultaneously controlling Iroquois. Item 138, p. 64. Thus, National Fuel concludes that Westwood cannot show that all the shares of both the buyer and seller were owned by the same company.

It is undisputed that Niagara was principally owned by NFGC when Niagara purchased the assets of BGC in 1921, and that these assets included $2,045,000.00 of a par value of a total issue $2,100,000.00 in People's bonds and $2,702,400 of a par value of $3,000,000.00 in People's stock. Ex. 13. This represented ninety-seven percent of People's stock and ninety percent of People's bonds. Judge received 30,000 shares of Niagara stock, at a par value of $100 per share. A voucher entry states that he then transferred the stock to NFGC in order to retire the $2,566,715.65 Judge Loan Account.

It is unclear what happened to the stock. There is significant evidence that a transfer of the stock was intended, but none that it actually took place. The Niagara stockholder's resolution and Judge's petition to the PSC both described the deal as including the stock. Exs. 13, 170; National Fuel Exs. 9, 10. The annual report of the PSC for 1924

describes People's as being owned by Iroquois through ownership of a majority of People's stocks. A PSC report·issued pursuant to an Iroquois petition also stated that BGC owned the majority of the People's stocks and bonds, and that the majority ownership was subsequently exercised by Judge, Niagara, and Iroquois. Ex. 43. On the other hand, in a letter from Thomas Weymouth, president of Iroquois, to Judge Kenefick, dated June 24, 1926, Weymouth states that as of that date Judge continued to hold 27,016 shares of People's stock. Ex. 59. In addition, as noted above, no memoranda of the stock transfer was ever recorded. ·

Regardless of who actually held the stock, the site was under the direct control of NFGC from 1917 through the foreclosure sale in 1925. In 1921, the BGC assets were transferred from Judge, whom the court has determined was an agent of NFGC, to Niagara, a corporation principally owned by NFGC. In December 1922, Niagara merged into Iroquois. In November 1925, Iroquois conducted a foreclosure sale in order to gain fee simple title because some of the People's bonds had been lost. At this foreclosure sale, Iroquois essentially purchased the site from itself.

Even assuming that Judge continued to hold 27,016 shares of People's stock after the transfer, it would elevate form over substance not to find a continuity of shareholders. First, the fact that Judge may have held the stock after the voucher recorded he had transferred it to NFGC indicates that the stock was worthless and its transfer nothing more than a paper formality. More importantly, there is no evidence that any entity that was not a subsidiary or agent of NFGC ever held the BGC and People's assets after the sale to Judge in 1917.

### b. Continuity of Operations

Having found a continuity of shareholders, the court turns to the continuity of operations. Westwood concedes that before the 1925 foreclosure sale, People's had not operated its plant since 1901. Item 135, p. 51. BGC acquired 26,824 of 30,000 shares of People's stock sometime before 1901. PF 16. In 1901, BGC and People's entered into a lease for the site. Then, in 1917, Judge acquired both the BGC and the People's assets.

National Fuel argues that People's was a shell corporation, and did not conduct any operations. Item 138, p. 53. According to National Fuel, there can be no claim that Iroquois leased the gas manufacturing facilities to others. Since leasing was the only business People's ever conducted, there can be no argument that the business of People's was continued. *Id.*

■ This argument is correct as far as it goes. What it ignores is the fact that People's itself was owned by BGC, which was the company that conducted the actual gas manufacturing. BGC therefore controlled the site via its ownership of People's. The court has already held that BGC and People's operated as joint venture for the purpose of operating the plant. Those operations were continuous from 1901 to 1925. It would defy common sense to hold that the existence of an intermediate shell corporation defeats the continuity of operations. There is no evidence on which to base any distinction between the business operations of BGC and those of People's after 1901.

National Fuel again raises the argument that there was no continuity of personnel, management or directors. Item 138, p. 55. Again, while this may be true at the site level, at the corporate level the site was principally owned by NFGC, both before and after the foreclosure sale.

### c. Prompt Cessation of Seller's Operations

National Fuel argues that People's did not dissolve after the foreclosure sale, but instead continued operations until it was dissolved by the Secretary of State in 1932. National Fuel cites *Kleen Laundry and Dry Cleaning Services, Inc. v. Total Waste Management Corp.*, 817 F.Supp. 225, 231 (D.N.H. 1993), for the proposition that a corporation cannot be found to be a continuation of the predecessor unless only one corporation remains after the transfer of assets. Item 138, p. 65.

■ The court reads the *Kleen Laundry* case to mean one *functioning* corporation. After the foreclosure sale, People's existed only on the corporate register; it did not hold itself out in the marketplace as a supplier of gas, it had no markets, and no independent operation of its assets or lease agreements. In addition, ninety-seven percent of People's stock and ninety percent of its bonds were owned by Iroquois through Iroquois' ownership in fee simple of the BGC assets. The mere existence of a remaining paper corporation does not defeat the application of the de facto merger doctrine.

### d. Assumption of Seller's Liabilities

Westwood argues that People's liabilities were reflected in the judgment of foreclosure and its obligations under the bonds. As a result, Iroquois discharged or assumed all People's liabilities. Item 135, p. 52. As previously noted, National Fuel argues that if the purchase of the People's bonds amounted to an assumption of People's liabilities for the purposes of the de facto merger doctrine, then People's underwent a de facto merger with BGC in 1899, and was not still available to merge again in either 1917 or 1925. Item 138, p. 68.

This argument is technically accurate. But there was no de facto merger between People's and BGC. Rather, People's operated the manufacturing plant as a joint venture with BGC. When BGC was transferred to Niagara, Niagara assumed operation of the plant, but People's continued on as a paper corporation with bond obligations.

■ Therefore, when Iroquois purchased the bonds, it assumed substantially all of People's remaining obligations. Although People's may have had some incidental tax, utility, and maintenance expenses, the bond obligations represented substantially all the obligations necessary to the operation of the business.

### 3. Additional Factors

National Fuel argues finally that courts employing the substantial continuity test in other circuits have considered additional factors that are not met in the present case. These factors include: (a) the continuity of assets, employees, supervising personnel, and physical location; (b) production of the same product; (c) retention of the same name; (d) continuity of general business operations; and (e) the purchaser holding itself out as a continuation of the seller. Item 138, p. 76, citing *Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1265, n. 7. (9th Cir.1990).

As already noted, the Second Circuit in *Betkoski*, 99 F.3d at 519, applied the substantial continuity doctrine to the "mere continuation" exception only. The court declines to modify the *Arnold Graphics* test based on the substantial continuity doctrine.

National Fuel also argues that courts in this district have previously held that application of the substantial continuity exception is limited to instances where the purchaser had actual notice of the potential CERCLA liability. *State of New York v. Panex Industries, Inc.*, 1996 WL 378172 (W.D.N.Y.) (Elfvin, J.). This court notes that in *Panex*, Judge Elfvin was faced with alternative arguments of de facto merger and mere continuation analysis. Judge Elfvin considered the notice issue in his discussion of the mere continuation analysis, and not as part of the de facto merger portion of the decision. *Id.* at *7–*9.

But, even if this court were to apply a notice requirement to the de facto merger exception generally, such a requirement would make little sense in this case. Although Iroquois management could not have contemplated CERCLA liability per se, the foreclosure sale in no way disrupted their knowledge of their own operations on the site. The holding in *Panex* is simply inapplicable to the facts of the present case.

The court does not find that National Fuel's analysis of any of the other factors contradicts the analysis and findings the court has made.

### CONCLUSION

For the foregoing reasons, the court finds that between 1917 and 1921, William Judge acted as agent for NFGC when he purchased and operated the BGC assets, and that National Fuel is therefore responsible for any

liabilities attributable to Judge's operation of the site. Based on this conclusion, the court does not reach the question of whether Niagara contractually assumed Judge's liabilities. The court also finds that the November 25, 1925, foreclosure sale constituted a de facto merger of People's into Iroquois.

The court therefore concludes that National Fuel is liable under CERCLA for all operations at the site from 1898 until Westwood purchased the site in 1972.

So ordered.